# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

J.D.D.A,

    *Petitioner,*

  v.

STEPHEN KURZDORFER, in his official capacity as Acting Field Office Director, Buffalo Field Office, U.S. Immigration and Customs Enforcement;

JOSEPH FREDEN, in his official capacities as Deputy Field Office Director, Buffalo Field Office, U.S. Customs and Immigration Enforcement, and Administrator, Buffalo Federal Detention Facility;

TODD M. LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement;

KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security;

DAREN K. MARGOLIN, in his official capacity as Director, Executive Office for Immigration Review, U.S. Department of Justice; and

PAMELA BONDI, in her official capacity as Attorney General of the United States,

    *Respondents.*

Case No. 1:25-cv-998

**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS**

## PRELIMINARY STATEMENT

1.     Petitioner J.D.D.A. is a 30-year-old man from El Salvador who has overcome relentless trauma throughout his life.[1] When confronted with imminent threats of death by MS-13 members at just 11 years old, J.D.D.A. fled El Salvador with his younger brother in fear for their lives. J.D.D.A.'s life is rooted in his commitment to his family, namely, his younger brother and mother, who rely on him for financial and emotional support. J.D.D.A. has spent years working through the traumas he endured and has taken full responsibility for his past mistakes in life. Since 2022, J.D.D.A. has worked tirelessly to build healthy, sustainable skills to deal with life's obstacles. Nonetheless, the government sought to deport J.D.D.A. to El Salvador and detained him following his release from criminal incarceration in November 2023.

2.     Since November 8, 2023, J.D.D.A. has remained in U.S. Immigration and Customs Enforcement ("ICE") detention, a period of 22 months. ICE continues to detain J.D.D.A. even though an Immigration Judge ("IJ") granted J.D.D.A. withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3), based on his imminent risk of torture and death by Salvadoran authorities, MS-13 members, and/or rival gang members in El Salvador. Even though ICE counsel did not reserve appeal of the IJ's decision to the Board of Immigration Appeals ("BIA"), which rendered J.D.D.A.'s grant of withholding of removal final, ICE

---

[1] Accompanying this petition is a motion to proceed by initials for Petitioner J.D.D.A., to redact the middle and last names of J.D.D.A.'s family members, and to redact J.D.D.A.'s Alien Registration Number ("A Number").

did not release J.D.D.A. from its custody. Four months after the IJ granted J.D.D.A. withholding of removal to El Salvador, J.D.D.A.'s counsel discovered that ICE now intends to deport J.D.D.A. to Mexico, a country not designated by the IJ and one that J.D.D.A. has never known. J.D.D.A. moved to reopen his removal proceedings before the IJ in order to present a claim for withholding of removal from Mexico, a country that had not been designated as a country of removal in his prior removal proceedings. The IJ granted J.D.D.A.'s motion to reopen proceedings, and the new removal case remains pending. In the meantime, ICE continues to detain J.D.D.A. in immigration custody, with no clear end in sight. J.D.D.A., his mother, his younger brother, and his stepfather are suffering greatly as a result of his continued detention. J.D.D.A. has suffered from anxiety, depression, and sleep issues from the onset. The uncertainty of his continued detention, with no clear date of release, has worsened these issues. J.D.D.A. has not received adequate medical care for both his mental health and long-term, physically debilitating injuries he has sustained.

3.     J.D.D.A.'s continued imprisonment is unconstitutional under binding civil detention precedents in the Second Circuit, which require the government to bear a heightened burden to justify detention, and which mandate that a neutral adjudicator consider less restrictive forms of supervision before remanding an individual to custody. J.D.D.A. filed a *pro se* request for bond redetermination in immigration court to remedy his non-mandatory detention pursuant to 8 U.S.C. § 1226(a). The IJ who presided over J.D.D.A.'s bond hearing denied his bond request after requiring J.D.D.A. to bear the burden of proof that he was not a danger to the

community or a risk of flight—even though the Second Circuit has affirmed the longstanding principle that, when seeking to justify civil detention, it is the government that must bear the burden by clear and convincing evidence of demonstrating that the individual is a danger or a flight risk. *See Black v. Decker*, 103 F.4th 133, 155–57 (2d Cir. 2024); *see also Velasco Lopez v. Decker*, 978 F.3d 842, 854 (2d Cir. 2020).

4.      Moreover, after J.D.D.A was granted withholding of removal, ICE officials failed to communicate with or interview J.D.D.A during the standard 90-day post-order custody file review mandated by 8 C.F.R. § 241.4 and summarily denied release only a few days after J.D.D.A. submitted evidence to ICE in support of his release. Now that J.D.D.A.'s proceedings before the IJ have been reopened, in light of ICE's intent to remove him to a country not previously designated for removal, J.D.D.A.'s detention under 8 U.S.C. § 1226(a) will be further prolonged. The ongoing and increasingly prolonged nature of his detention compels a second bond hearing with the burden of proof properly placed on the government and constitutional protections.

5.      To remedy J.D.D.A.'s unlawful detention, this Court should order his release unless the government provides him a constitutionally adequate bond hearing in which ICE bears the burden to justify his detention by clear and convincing evidence, and where the IJ analyzes the potential mitigative impact of alternatives to detention and considers ability to pay.

## PARTIES

6.     Petitioner J.D.D.A. is 30 years old and has lived in the United States for approximately 18 years. *See* Exh. A, Declaration of J.D.D.A. ("J.D.D.A. Decl."), ¶ 1. He has been detained in immigration custody for over 22 months, including approximately 17 months at Moshannon Valley Processing Center, in Philipsburg, Pennsylvania, and five months at the Buffalo Federal Detention Facility in Batavia, New York, where he is currently detained. *Id.* ¶ 5.

7.     Respondent STEPHEN KURZDORFER is named in his official capacity as the Acting Field Office Director of the Buffalo Field Office for ICE within the Department of Homeland Security ("DHS"). In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations. Respondent Kurzdorfer's address is Buffalo Immigration and Customs Enforcement Field Office, 250 Delaware Avenue, Floor 7, Buffalo, NY 14202. Respondent Kurzdorfer is a legal custodian of J.D.D.A.

8.     Respondent JOSEPH FREDEN is named in his official capacities as the Deputy Field Office Director of the Buffalo Field Office for ICE and as the Administrator of the Buffalo Federal Detention Facility in Batavia, New York, where J.D.D.A.is currently detained. Respondent Freden's address is Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. Respondent Freden is a legal custodian of J.D.D.A.

9.     Respondent TODD M. LYONS is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the

administration and enforcement of the immigration laws of the United States, routinely transacts business in the Western District of New York, and is legally responsible for pursuing any effort to detain and remove J.D.D.A. Respondent Lyons' address is ICE Office of the Principal Legal Advisor, 500 12th St., SW, Mail Stop 5900, Washington, DC 20536-5900. Respondent Lyons is a legal custodian of J.D.D.A.

10.     Respondent KRISTI NOEM is named in her official capacity as the Secretary of Homeland Security in DHS. In this capacity, she is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103(a), routinely transacts business in the Western District of New York, and is legally responsible for pursuing any effort to detain and remove J.D.D.A. Respondent Noem's address is Office of the General Counsel, U.S. Department of Homeland Security, 245 Murray Lane, SW, Mail Stop 0485, Washington, DC 20528. Respondent Noem is J.D.D.A.'s legal custodian.

11.     Respondent DAREN K. MARGOLIN is named in his official capacity as the Director of the Executive Office for Immigration Review ("EOIR") in the U.S. Department of Justice. In this capacity, he is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103(g). She is legally responsible for administering J.D.D.A.'s removal proceedings and the standards used in those proceedings. Respondent Margolin's address is Executive Office for Immigration Review, 5107 Leesburg Pike, Falls Church, VA 22041. Respondent Margolin is legally responsible for administering J.D.D.A.'s custody and removal proceedings and the standards used in those proceedings.

12.     Respondent Kristi NOEM is named in her official capacity as the Secretary of the Department of Homeland Security. In this capacity, she is responsible for the administration of the U.S. immigration laws, and as such is a legal custodian J.D.D.A. Ms. Noem routinely transacts business in the Western District of New York and supervises Mr. Brophy. Mr. Noem's address is Secretary of Homeland Security, U.S. Department of Homeland Security, Washington, DC 20528.

13.     Respondent PAMELA BONDI is named in her official capacity as the Attorney General of the United States in the U.S. Department of Justice. In this capacity, she is responsible for the administration of the immigration laws as exercised by EOIR pursuant to 8 U.S.C. § 1103(g). Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530. Respondent Bondi is legally responsible for administering J.D.D.A.'s removal proceedings and the standards used in those proceedings.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); Article I, § 9, cl. 2 of the United States Constitution (Suspension Clause); 5 U.S.C. § 706 (Administrative Procedure Act ("APA")); 28 U.S.C. § 2201 (Declaratory Judgment); and 28 U.S.C. § 1651 (All Writs Act).

15.     Venue is proper in this District under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. J.D.D.A. is incarcerated within this District; the ICE office that controls the

location of his detention is based in Buffalo, New York; and a substantial part of the events giving rise to the claims and relevant facts occurred in this District

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.    J.D.D.A. exhausted all the administrative remedies available to him. J.D.D.A. filed a *pro se* request for a custody redetermination hearing before an IJ pursuant to 8 C.F.R. § 1236, which was denied on July 17, 2024. *See* Exh. F, Bond Denial Order of the Immigration Judge, dated July 17, 2025 ("IJ Bond Denial Dec."), 1. Even after an IJ granted J.D.D.A. withholding of removal to El Salvador on February 21, 2025 and ICE did not appeal, ICE officials nonetheless continue to detain J.D.D.A. ICE conducted a perfunctory 90-day post-order custody review pursuant to 8 C.F.R. § 241.4 and affirmatively denied release on May 28, 2025. ICE denied release only a few days after J.D.D.A.'s evidentiary submission to ICE in support of his release, and without any mention of the evidence presented.

17.    Moreover, J.D.D.A.'s claims of unlawful detention are not subject to any statutory exhaustion requirement. "No statute requires [a noncitizen] to exhaust administrative remedies before challenging detention." *Lopez v. Barr*, 458 F. Supp. 3d 171, 176 (W.D.N.Y. 2020) (holding that petitioner was not required to exhaust administrative remedies prior to challenging in federal court whether § 1226(a) and the Constitution require a bond hearing where the government bears the burden of proof).

18.    Even if the Court requires administrative exhaustion as a prudential matter, J.D.D.A.'s case falls within an exception because his petition raises

"constitutional questions . . . that the BIA does not have jurisdiction to adjudicate." *Blandon v. Barr*, 434 F. Supp. 3d 30, 37 (W.D.N.Y. 2020) (internal quotation marks omitted); *see also Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003) (noting prudential exhaustion may be waived when "a plaintiff has raised a substantial constitutional question"). Indeed, courts in this District regularly find that "exhaustion . . . as a prudential matter" is waived where the issue presented is the standard of proof to be applied at a bond hearing, noting that "the available administrative remedies provide no genuine opportunity for adequate relief because the burden of proof the IJ would use at a bond hearing in the absence of an order from this Court does not comply with due process." *See Blandon*, 2019 WL 7759228, at *4; *see also Lopez*, 458 F. Supp. 3d at 176 ("The Court will not require exhaustion here. [The petitioner's] petition argues that § 1226(a) and the Constitution require the government to bear the burden of proof during a bond hearing. Such statutory and constitutional questions cannot be decided by an IJ or the BIA, and accordingly [the petitioner] was not required to exhaust his administrative remedies before bringing this claim in federal court.") (internal quotation marks omitted).

## STATEMENT OF FACTS

### A. Background

19.     J.D.D.A. was born in 1995 in San Miguel, El Salvador. J.D.D.A. Decl., ¶ 1. In El Salvador, J.D.D.A. and his younger brother Emilio were raised by their single mother until she fled to the United States when J.D.D.A. was around nine years old.

*See* Exh. B, Declaration of Karla ("Karla Decl."), ¶ 4. From then on, J.D.D.A. and his younger brother were raised by their great grandmother. *Id.* ¶ 6.

20.     Struggling to find structure and support at a tender age, J.D.D.A. fell in with some older friends who were members of the MS-13 gang. Despite pressure from gang members, J.D.D.A. refused to join MS-13. J.D.D.A. Decl. ¶ 7; *see* Declaration of Shayna Scott, Esq. ("Scott Decl."), ¶ 8. Members of the MS-13 gang forced J.D.D.A. to witness beatings and attacks against suspected rival gang members. MS-13 members also tried to recruit J.D.D.A., but he refused their advances. J.D.D.A. Decl., ¶ 1. After receiving several threats to himself and his family, J.D.D.A. knew that he and his brother were at grave risk of torture and death by the MS-13 members who targeted J.D.D.A. for defying recruitment and gang authority, as well as by rival gangs who erroneously believed J.D.D.A. was a member of MS-13. *Id.* ¶ 8. J.D.D.A. fled El Salvador with his younger brother at just 11 or 12 years old. He has continuously resided in the United States since 2007. *Id.* ¶ 1.

21.     In the United States, J.D.D.A. reunited with his mother but struggled to find stability, bouncing between homes of family members in New York, first with his grandmother in Long Island, then his mother and her uncle in Queens. *Id.* ¶ 2. As a result of moving, he changed schools several times. *Id.* ¶ 2. When J.D.D.A. was around 16 years old, he learned that his biological father, whom he had never known, had raped his mother when she was just 13 years old. *Id.* ¶ 3; Karla Decl., ¶ 5. He felt helpless, guilty, and devastated, and tried to escape from his feelings. J.D.D.A. Decl., ¶ 3; Karla Decl., ¶ 5. J.D.D.A. turned to drugs and alcohol to numb the pain and avoid

thinking about what happened to his mother. J.D.D.A. Decl., ¶ 3. When he was self-medicating with drugs and alcohol, J.D.D.A. was arrested for property-related offenses on various occasions. Scott Decl., ¶ 5

22.    After his arrest in May 2022, J.D.D.A. immersed himself in a three-month rehabilitation program and gained meaningful insight into the forces that had fueled his addiction. J.D.D.A. Decl., ¶ 4. Though he wished to continue participation in the program, J.D.D.A. left the rehabilitation program in September or October 2022 to attend his court appearance for his criminal case. *Id.* ¶ 4. The judge congratulated J.D.D.A. for his genuine rehabilitative efforts but was unable to take J.D.D.A.'s participation into account for sentencing. The judge sentenced J.D.D.A. to 364 days of jail time. Scott Decl., ¶ 6. During his criminal sentence, J.D.D.A. dedicated himself to his sobriety, taking vocational, socioemotional, and college courses, attending church, and engaging with an outside faith-based mentorship program, Crossroads. *Id.* J.D.D.A. utilized every moment of his incarceration to better himself and rebuild his relationships with his loved ones. *Id.* He had planned to return to Corona Self-Help after serving his sentence to complete the twelve-step program. *Id.*

**B. J.D.D.A.'s Removal Proceedings and Subsequent Motion to Reopen**

23.    Upon his release from criminal custody on November 8, 2023, J.D.D.A. was detained in immigration custody. *Id.* ¶ 5. J.D.D.A. was initially detained at the Orange County Jail in Goshen, New York, and was subsequently transferred to the

Moshannon Valley Processing Center ("MVPC") in Philipsburg, Pennsylvania, until April 2025. *Id.* ¶ 11.

24.    On November 8, 2023, ICE issued a Notice to Appear ("NTA"), charging J.D.D.A. as inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) (entering the United States without admission or parole), and 8 U.S.C. § 1182(a)(2)(A)(i)(I) (conviction of a crime involving moral turpitude). Scott Decl., ¶ 7.

25.    J.D.D.A. first learned that ICE had labeled him as an MS-13 gang member in November 2023. J.D.D.A. Decl., ¶ 7. J.D.D.A. overheard the ICE officers discussing how to separate him from another detainee in their van, who was allegedly part of the 18th Street gang, which is a rival gang of MS-13. He later received a copy of his Form I-213, Record of Deportable/Inadmissible Alien ("I-213"), stating that he was a "associate/active of M.S. 13" and a "member of MS13 gang." Scott Decl., ¶ 7. Prior to this time, J.D.D.A. was unaware of any gang label affixed to him. He was never separated in criminal custody from other inmates, and he was permitted to work in the kitchen, a role forbidden to alleged gang members. J.D.D.A. Decl., ¶ 19.

26.    From November 2023 to September 2024, J.D.D.A. appeared *pro se* at his appearances before the immigration court due to difficulties in securing representation. *Id.* ¶ 6.

27.    He had initial "master calendar" hearings in New York, New York, and then in Elizabeth, New Jersey, both *pro se*. *Id.* At the latter, he received a copy of his I-213, learned of his erroneous MS-13 label, and denied any affiliation with the gang. *Id.* ¶¶ 7-8. J.D.D.A. again appeared *pro se* before the IJ at the Elizabeth Immigration

Court on January 31, 2024. *Id.* ¶¶ 7-8. The IJ sustained the charge of removability under 8 U.S.C. § 212(a)(6)(A)(i) and designated El Salvador as the country of removal. The IJ declined to designate an alternative country of removal. Scott Decl., ¶ 8. J.D.D.A. again reiterated that he was never affiliated with any gang, refuting accusations from Suffolk County law enforcement and the notation on the I-213. J.D.D.A. Decl., ¶ 8; Scott Decl., ¶ 8. The IJ then scheduled another master calendar hearing for March 13, 2024, by which date J.D.D.A. was required to file any applications for relief. J.D.D.A. also asked for a bond hearing and was given information about the procedures. J.D.D.A. Decl., ¶ 12; Scott Decl., ¶ 8. On March 13, 2024, J.D.D.A. appeared *pro se* and asked for additional time to file his Form I-589 application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") ("I-589"). He explained his difficulties understanding the I-589 application and required evidence and finding representation for his removal proceedings. The IJ adjourned the case until April 24, 2024, for another master calendar hearing. J.D.D.A. Decl., ¶ 8; Scott Decl., ¶ 8.

28.     On April 7, 2024, J.D.D.A. submitted a *pro se* I-589 application, which was subsequently amended with the support of counsel on October 4, 2024.[2] J.D.D.A. Decl., ¶ 8; Scott Decl., ¶ 8. J.D.D.A. asserted claims of future persecution by Salvadoran government officials and Salvadoran gangs on account of his anti-gang political opinion and membership in several particular social groups based on his

---

[2] In addition to his I-589 application, J.D.D.A. applied for Cancellation of Removal on Form EOIR-42B, which he subsequently withdrew on December 30, 2024.

deportee status, his prior criminal record in the United States, his erroneous MS-13 label by U.S. authorities, and his resistance to gang recruitment in El Salvador. J.D.D.A. Decl., ¶ 8; Scott Decl., ¶ 10. On April 24, 2024, J.D.D.A. appeared *pro se* and again emphasized that he was erroneously labeled an MS-13 member. J.D.D.A. Decl., ¶ 8; Scott Decl., ¶ 8. The IJ scheduled an individual merits hearing ("IH") to adjudicate J.D.D.A.'s I-589 for August 2024, which was subsequently reset to September 2024 to allow J.D.D.A. time to gather evidence and submit a brief *pro se*. J.D.D.A. Decl., ¶ 8. J.D.D.A. submitted to the court as much evidence as he could gather on his own in advance of the scheduled IH, despite the extraordinary hurdles of doing so while detained in ICE custody. *Id.* ¶¶ 8-9. After repeated attempts to obtain representation from various immigration organizations, J.D.D.A. finally secured counsel at The Legal Aid Society in mid-September 2024, and the IJ reset J.D.D.A.'s IH until February 21, 2025. *Id.* ¶ 9; Scott Decl., ¶ 10.

29.     An individual merits hearing on J.D.D.A.'s applications for asylum, withholding of removal, and CAT protection took place on February 21, 2025, before IJ Richard Bailey at the Elizabeth Immigration Court. J.D.D.A. Decl., ¶ 9; Scott Decl., ¶ 10. At the hearing, J.D.D.A. provided testimonial and documentary evidence that he would likely face persecution in El Salvador because of his membership in several protected social groups and his political opinion. Scott Decl., ¶ 10. To support J.D.D.A.'s claim, J.D.D.A.'s counsel presented voluminous documentary evidence and country conditions expert testimony demonstrating  that J.D.D.A. would be immediately targeted as a suspected gang member due to his deportee status, his

erroneous MS-13 label by U.S. authorities, and his prior criminal record in the United States, and would be tortured or even killed by Salvadoran authorities or by local Salvadoran gangs both in and outside of prison, in any part of the country, with the tacit approval of the Salvadoran government. *Id.* ¶ 10.

30.     At the conclusion of the hearing, IJ Bailey found that J.D.D.A. had established his eligibility for withholding of removal under the INA based on the likelihood of persecution by Salvadoran authorities on account of his membership in a protected social group. Scott Decl., ¶ 10. J.D.D.A. and counsel for the government waived appeal, so the IJ's order and decision immediately became final. Exh. E, Order of the Immigration Judge, dated February 21, 2025 ("IJ Withholding Grant Dec."), 1; J.D.D.A. Decl., ¶ 9; Scott Decl., ¶ 10. Although J.D.D.A. was granted immigration relief, ICE nonetheless continued to detain J.D.D.A. and ultimately transferred him to the Buffalo Federal Detention Facility ("BFDF") in Batavia, New York, around April 2025, where he remains detained. J.D.D.A. Decl., ¶¶ 10-11.

31.     ICE detained J.D.D.A. for four months after the IJ granted him withholding of removal before they notified him of their intent to remove him to Mexico. *Id.* ¶ 10. On June 23, 2025, J.D.D.A. received a notice of DHS's intent to deport him to Mexico even though he is an El Salvadoran national and has no connection to Mexico. *Id.* ¶ 10; Exh. I, ICE Notice of Removal to Mexico. On June 26, 2025, J.D.D.A.'s counsel filed both an emergency motion to stay removal and an emergency motion to reopen the immigration court removal proceedings with the immigration court based on DHS's intent to deport J.D.D.A. to an undesignated third

country of removal without an opportunity to contest removal to Mexico and express his fear of persecution and torture there. Scott Decl. ¶ 12; J.D.D.A. Decl., ¶ 10. The IJ granted the emergency motion to stay removal on June 26, 2025 and granted the motion to reopen on July 17, 2025. Scott Decl., ¶ 13; Exh. J, Order of the Immigration Judge, dated June 26, 2025 ("IJ Emergency Stay Grant"); Exh. K, Order of the Immigration Judge, dated July 17, 2025 ("IJ Motion to Reopen Grant").

32.    In the reopened proceedings, IJ Bailey presided over J.D.D.A.'s master calendar hearing on July 30, 2025, and requested counsel to submit briefing regarding the authority of the IJ to adjudicate fear-based claims for undesignated countries, and the "burden-shifting" framework for such claims pursuant to 8 U.S.C. § 1231(b). Scott Decl., ¶ 13. On August 13, 2025, IJ Bailey found that the court had authority to adjudicate J.D.D.A.'s eligibility for protection against removal to Mexico, a place that he has never known and where he will face persecution, and set an individual merits hearing on September 30, 2025, with an evidentiary deadline of September 16, 2025. *Id.* ¶ 26.

33.    Between August 27, 2025, and September 11, 2025, J.D.D.A.'s case has been rescheduled twice by the court, adjourned once by the court, and transferred between four different IJs, depriving J.D.D.A. of weeks of necessary preparation time. On August 27, 2025, J.D.D.A.'s counsel received notice that his IH had been suddenly advanced from September 30, 2025, to September 18, 2025, and transferred to IJ Shirole, with an evidentiary deadline of September 4, 2025. *Id.* ¶ 26. J.D.D.A.'s counsel immediately filed a motion for a continuance because she was on planned,

international vacation and had several hearings with competing deadlines that she had explained to IJ Bailey on August 13, 2025. *Id.* IJ Shirole granted the continuance on September 4, 2025. *Id.* On September 9, 2025, J.D.D.A. received notice that his merits hearing was scheduled for September 24, 2025, before IJ Rubenstein, with a presumptive evidentiary deadline on September 10, 2025, one day after the date of the hearing notice. *Id.* J.D.D.A.'s primary counsel was still on scheduled leave, so a supervising attorney of The Legal Aid Society filed a motion for a continuance on September 10, 2025. *Id.* That same day, IJ Rubenstein issued an order stating that the motion for a continuance was moot because DHS had filed a Form I-830, Notice to EOIR: Alien Address, and J.D.D.A.'s case would be transferred to an entirely different Immigration Court in the jurisdiction of a different circuit. *Id.* On September 17, 2025, J.D.D.A.'s counsel received a master calendar hearing notice scheduled for September 22, 2025, before IJ Harbeck of the Batavia Immigration Court. *Id.* At that hearing, IJ Harbeck scheduled J.D.D.A.'s merits hearing for October 27, 2025, with an evidentiary deadline on October 14, 2025. *Id.*

### C. J.D.D.A.'s Detention and Attempts to Secure Release

34. J.D.D.A. has been detained in immigration custody since November 8, 2023. J.D.D.A. Decl., ¶ 11. He was initially detained at Orange County Jail in Goshen, New York, and MVPC in Philipsburg, Pennsylvania. *Id.* In April 2025, he was transferred to the BFDF in Batavia, New York, over a month after the IJ's February 21, 2025 grant of withholding of removal from El Salvador. *Id.* ¶ 11.

35.     J.D.D.A. orally requested a bond hearing on both January 31, 2024, and April 24, 2024, but the IJ informed him that such hearings required a formal written request and supporting evidence. *Id.* ¶ 12; Scott Decl., ¶ 8. Due to his limited access to evidence in detention, J.D.D.A. ultimately filed a *pro se* request for a bond hearing on or about June 28, 2024. J.D.D.A. Decl., ¶ 12.  In support of his request, J.D.D.A. submitted letters of support from his family, friends, and his former employer; family photos; evidence of his rehabilitation; education, coursework, and certificates from his time in immigration custody; and evidence of his criminal history. *Id.* ICE submitted the I-213 and criminal records from Nassau County, New York. *Id.* The immigration court set a bond hearing for July 17, 2024. IJ Bailey presided over the hearing. *Id.* ¶ 12; Scott Decl., ¶ 8.

36.     Pursuant to controlling agency precedent, the IJ placed the burden of proof on J.D.D.A. to establish that he is not a danger to the community or a flight risk. *See Matter of Guerra*, 24 I&N Dec 37, 40 (BIA 2006) (describing the noncitizen's burden to establish to the satisfaction of the IJ that they do not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight); *see also Matter of Adeniji*, 22 I&N Dec. 1102, 1113 (BIA 1999) (placing the burden on noncitizens to demonstrate that they pose no risk of flight or danger); *Matter of Urena*, 25 I&N Dec. 140, 141 (BIA 2009) (holding that noncitizens must be detained without bail where they are unable to demonstrate they pose no danger to the community). The government, by contrast, bore no burden to justify his continued detention.

37.     Because the IJ required that J.D.D.A. establish that he was not dangerous "to the satisfaction of the immigration judge," *see Matter of Guerra,* 24 I&N Dec. at 40, J.D.D.A. was required to provide extensive evidence of his good character and family support. J.D.D.A. appeared *pro se* at his bond hearing and engaged in a lengthy discussion of his criminal history with the IJ. J.D.D.A. was forthcoming and responded to the best of his knowledge to questions about his arrest and conviction history. J.D.D.A. Decl., ¶ 12.  After reviewing J.D.D.A.'s arrest history over the course of a seven-year period, the IJ then asked J.D.D.A. about his identification as an MS-13 associate or active member. *Id.*; Scott Decl., ¶ 8. J.D.D.A. again denied ever being involved in MS-13. J.D.D.A. Decl., ¶ 12; Scott Decl., ¶ 8. When asked to explain why he was not a danger to the community, J.D.D.A. described his rehabilitation, his dedication to his faith, his coursework, and his strengthened relationships with his network of support. J.D.D.A. Decl., ¶ 12; Scott Decl., ¶ 8.

38.     At the conclusion of the hearing, the IJ denied J.D.D.A.'s request for release on bond. J.D.D.A. Decl., ¶ 12. The IJ commended J.D.D.A. for his *pro se* filings and rehabilitative efforts but found that J.D.D.A. failed to establish that he was not a danger to the community. IJ Bond Denial Dec., 1. The IJ set a deadline to appeal the bond decision for August 16, 2024, one day before J.D.D.A.'s evidentiary submission deadline on August 17, 2024, for his IH in support of the merits of his fear-based claims. *Id.* ¶ 12; Scott Decl., ¶ 8. Due to the difficulties and time-intensive nature of accessing evidence from detention, J.D.D.A. was unable to timely appeal

the IJ's bond denial, while also preparing his evidentiary submission on the merits of his claims. J.D.D.A. Decl., ¶ 12.

39.    J.D.D.A. remained detained at the MVPC throughout his removal proceedings. J.D.D.A. Decl., ¶ 11; Scott Decl., ¶ 7. At the conclusion of J.D.D.A.'s IH on February 21, 2025, the IJ issued an order granting J.D.D.A. withholding of removal under the INA, and both parties waived appeal. J.D.D.A. Decl., ¶ 13; Scott Decl., ¶ 10. On February 24, 2025, J.D.D.A.'s counsel received notice that ICE intended to continue J.D.D.A.'s detention while ICE attempted to find a third country for removal. Scott Decl., ¶ 17. ICE indicated that an officer would review J.D.D.A.'s custody status 90 days after the IJ's order on February 21, 2025, pursuant to 8 U.S.C. § 1231(a). J.D.D.A. Decl., ¶ 13. ICE then transferred J.D.D.A. to the BFDF in Batavia, New York around April 2025. *Id.* ¶ 14.

40.    On or about March 24, 2025, J.D.D.A. received notice that ICE would conduct a post-order custody status review on or about May 22, 2025, when the 90-day period for ICE to remove J.D.D.A. to a third country expired, pursuant to 8 U.S.C. § 1231(a). *Id.* ¶ 13. On May 1, 2025, through counsel, J.D.D.A. submitted evidence showing that he is not a danger to the community nor a flight risk, as required to secure post-order release from detention. *Id.* ¶ 15; Scott Decl., ¶ 11. J.D.D.A. submitted letters of support from family members, friends, and his prospective employer; a letter from his social worker; evidence of his rehabilitative efforts; his diploma; and transcripts and certificates for coursework completed while in ICE custody. J.D.D.A. Decl., ¶ 15.

41.     On or about May 27, 2025, Batavia Deportation Officer Brandon Smith stated that J.D.D.A.'s custody review would occur that week. Scott Decl., ¶ 11. Yet, on May 28, 2025, ICE issued a decision to continue J.D.D.A.'s detention, finding that J.D.D.A. had failed to demonstrate that he would not be a danger to the community if released. Exh. G, ICE Decision to Continue Detention, 1. This short decision by an ICE official did not reference any of the evidence in J.D.D.A.'s submission, such as proof of rehabilitation and letters of support, and was solely based on his criminal history. On June 3, 2025, J.D.D.A.'s counsel submitted a request for a personal interview with the ERO removal division. Scott Decl., ¶ 11. To date, J.D.D.A.'s counsel has not received any response to his request for a personal interview. *Id.* Additionally, at no point during the review process or after ICE's perfunctory decision did J.D.D.A. receive any direct contact or communication from the assigned deportation officer, or any other ICE officer, despite J.D.D.A.'s repeated requests for a personal interview. J.D.D.A. Decl., ¶¶ 10, 14.

### D. Detrimental Impacts of J.D.D.A.'s Prolonged Detention

42.     To date, J.D.D.A. is subject to the most severe restrictions in ICE detention because of his erroneous gang label. J.D.D.A. Decl., ¶ 19. He is limited in where he is housed, what resources he can access, and what jobs he can obtain. *Id.* Despite his many requests to appeal his erroneous gang label, he has been given no process to do so and told by detention facility case managers and ICE officers that any such effort would be fruitless. *Id.*

43.     Throughout J.D.D.A.'s time in ICE detention, living conditions have dramatically worsened. Since free phone calls were eliminated almost 1.5 years ago, J.D.D.A. has struggled to stay in regular contact with his family. *Id.* ¶ 20. His ability to speak with them is entirely dependent on their ability to pay the phone call fees. *Id.* J.D.D.A. witnessed a riot at the MVPC in response to the phone policy change, where both detainees and staff were hurt. *Id.* Even detainees who took no part in the incident, like J.D.D.A., were treated more harshly thereafter. *Id.* Since his transfer to the BFDF, J.D.D.A. has observed detainees forced to sleep on the floor because of overcrowding and the lack of bed space. *Id.* ¶ 25. At BFDF, restrooms are often soiled with waste and excrement due to restrictions on the number of toilet flushes per hour. *Id.* ¶ 26. J.D.D.A. has been forced to go without soap, toilet paper, and clean clothing, sometimes for days. *Id.* ¶¶ 27-28.

44.     J.D.D.A.'s prolonged ICE detention in squalid living conditions has been detrimental to his physical wellbeing and safety. At the BFDF, J.D.D.A. spends 18 hours each day locked in a cell. J.D.D.A. Decl., ¶ 23. Batavia's book program is suspended so there is little enrichment and his only company is his assigned bunkmate. *Id.* ¶ 24. J.D.D.A. has no privacy from his bunkmate, even when using the bathroom. *Id.* ¶ 24 . Before his detention in ICE custody, J.D.D.A. struggled with anxiety, depression, and insomnia. *Id.* ¶ 41; *see* Exh. D, Letter of Marlon Agustín-Mendez, LMSW ("Agustín-Mendez Letter"), 2. And now under these conditions, J.D.D.A. feels increasingly hopeless and despair. J.D.D.A. Decl., ¶ 46. J.D.D.A. has been repeatedly denied proper medical treatment by detention personnel. *Id.* ¶¶ 41-

42. J.D.D.A. injured both of his ankles while in detention, first around October 2024 and then in March 2025. *Id.* ¶¶ 34, 36. Each time, J.D.D.A. self-advocated for weeks or months before he was taken for an off-site medical appointment, MRI, or physical therapy. *Id.* ¶¶ 35, 37. When he has received outside treatment, conditions at the detention center severely undermined any impact. *Id.* ¶¶ 37. For example, when J.D.D.A. received a cast at an orthopedic appointment, it broke only a few days later because J.D.D.A. was not provided adequate materials to cover the cast while he showered. *Id.* ¶ 37. To this day, he is awaiting physical therapy sessions and prescription medication that were approved by external physicians months ago. *Id.* ¶¶ 38, 40; Scott Decl., ¶ 16.

45.    J.D.D.A.'s absence because of his detention has been devastating to his family. J.D.D.A. is very close with his mother, Karla, and served as an "almost paternal protector" for his younger brother, Emilio. *See* Karla Decl., ¶ 19. Karla and Emilio are unable to visit J.D.D.A. in detention because he is detained hundreds of miles from their home in Suffolk County, New York. J.D.D.A. Decl., ¶ 47. Karla and Emilio have not seen J.D.D.A. in almost two years now, and they both grapple with feelings of depression and despair. *Id.* ¶ 47, 49; Karla Decl., ¶¶ 14, 18, 19; Exh. C, Declaration of Emilio ("Emilio Decl."), ¶¶ 8, 12-13. They are also facing financial strain. Emilio Decl., ¶ 14. Without J.D.D.A.'s financial contributions, his mother, brother, and stepfather are struggling to make mortgage payments on their home. *Id.*

## LEGAL ARGUMENT

46.     Since its enactment in 1952, the INA has contained a pretrial detention provision, now located at 8 U.S.C. § 1226(a), which authorizes the Attorney General to detain or release noncitizens during their immigration proceedings.

47.     Though immigration officials have long held the power to discretionarily detain noncitizens during removal proceedings, they historically exercised this presumption in favor of liberty. *See Velasco Lopez*, 978 F.3d at 848 (describing the BIA's historical practice of requiring that the government justify detention at immigration bond hearings).

48.     In 1999, the BIA abruptly reversed its longstanding presumption of freedom in *Matter of Adeniji*, 22 I&N Dec. at 1113, placing the burden on the noncitizen to demonstrate that they are neither a flight risk nor a danger to the community. *See Velasco Lopez*, 978 F.3d at 849 (citing *Adeniji*, 22 I&N Dec. at 1112). The BIA has restated the holding of *Adeniji*, without any discussion of its constitutionality, in several cases since. *See, e.g.*, *Matter of Guerra*, 24 I&N Dec at 40; *Matter of Urena*, 25 I&N Dec. at 141; *Matter of Fatahi*, 26 I&N Dec. 791, 793 (BIA 2016); *Matter of Siniauskus*, 27 I&N Dec. 207, 207 (BIA 2018).

49.     This burden allocation is unlawful because it violates J.D.D.A.'s right to due process under the Fifth Amendment. It also rests on an arbitrary and capricious change in longstanding agency policy that contravenes the Administrative Procedure Act ("APA").

## I.     The Constitution Entitles J.D.D.A. to a Hearing in Which the Government Must Justify that His Detention Is Necessary Through Clear and Convincing Evidence.

50.     The Due Process Clause of the Fifth Amendment states that "[n]o person shall be . . . deprived of . . . liberty . . . without due process of law." U.S. Const. Amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). This freedom "has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). The Due Process Clause "covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at 850 (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)).

51.     Any statute that permits detention of a noncitizen must comport with the Constitution. *See Zadvydas*, 533 U.S. at 690. The Supreme Court has noted that "[a] statute permitting indefinite detention of [a noncitizen] would raise a serious constitutional problem." *Id.* As such, the Supreme Court has recognized only two valid purposes for civil detention: protecting the community and preventing flight. *See id.* Even when the government invokes these reasons, due process requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding imprisonment. *Id.* And "[t]he Supreme Court has been unambiguous that executive detention orders, which occur without the procedural

protections required in courts of law, call for the most searching review." *Velasco Lopez*, 978 F.3d at 850 (citing *Boumediene v. Bush*, 553 U.S. 723, 781–83 (2008); *I.N.S. v. St. Cyr*, 553 U.S. 289, 301–02 (2001)).

52.     When reviewing the constitutionality of the allocation of the burden of proof in immigration bond proceedings, the Second Circuit has applied the three-factor balancing test laid out by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See Velasco Lopez*, 978 F.3d at 851. The *Mathews* test requires consideration of (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Applying the *Matthews* framework, the Second Circuit held in *Velasco Lopez v. Decker* that noncitizens subject to prolonged detention under 8 U.S.C. § 1226(a) are entitled to a bond hearing where the government bears the burden of proof by clear and convincing evidence. 978 F.3d 851–56.

53.     The Second Circuit again applied the *Mathews* framework in *Black v. Decker*, which followed *Velasco Lopez*, and held that in immigration bond proceedings, "[w]here the government seeks to continue depriving a person of their liberty—especially when a district court has already found that deprivation to be unconstitutionally prolonged—we must require the government to bear the burden

of proving the need for continued detention." 103 F.4th at 155. This ruling accorded with the "consensus view that where . . . the government seeks to detain [a noncitizen] pending removal proceedings, it bears the burden of proving that such detention is justified," *Rajesh v. Barr*, 420 F. Supp. 3d 78, 86 (W.D.N.Y. 2019) (quoting *Darko v. Sessions*, 342 F. Supp. 3d 429, 434–36 (S.D.N.Y. 2018)), regardless of whether the detention has become prolonged.

54.     Moreover, "[t]he Supreme Court has consistently held the Government to a standard of proof higher than a preponderance of the evidence where liberty is at stake, and has reaffirmed the clear and convincing standard for various types of civil detention." *Velasco Lopez*, 978 F.3d at 855 (collecting cases). Accordingly, after applying the *Mathews* factors to immigration bond proceedings, the Second Circuit has reaffirmed "that the government justify continued detention by clear and convincing evidence." *Black*, 103 F.4th at 157.

55.     Here, the government's continued detention of J.D.D.A. violates the Due Process Clause for at least two reasons that fall within the ambit of the Second Circuit's decisions in *Velasco Lopez* and *Black*. First, the bond hearing that J.D.D.A. received before IJ Bailey on July 17, 2024 was not constitutionally adequate, as IJ Bailey improperly forced J.D.D.A. to bear the burden of showing why his release was warranted. Second, regardless of the deficiencies of the July 17, 2024 bond hearing, J.D.D.A. is at this time entitled to a new bond hearing with the enhanced procedural protections outlined by the Second Circuit in *Velasco Lopez* and *Black* because

J.D.D.A.'s detention of over 22 months has been unreasonably prolonged and will likely continue for months or years unless this Court grants him relief.

56.    The proper remedy for an inadequate or unconstitutional bonding hearing, the Second Circuit has held, is a new bond hearing with the requisite constitutional protections . *Velasco Lopez*, 978 F.3d at 855–56.

### A. The Allocation of the Burden of Proof at J.D.D.A.'s Original Bond Hearing Was Unconstitutional.

57.    In placing the burden on J.D.D.A. to establish that he merited release on bond, the IJ relied on agency regulations and case law. *See Matter of Guerra*, 24 I&N Dec. at 40; *see also Matter of Adeniji*, 22 I&N Dec. at 1112; 8 C.F.R. § 1236.1(c)(8). But even if the IJ's actions were consistent with agency precedent, they cannot be reconciled with the Constitution.

58.    In *Velasco Lopez*, the Second Circuit affirmed these "important constitutional limitations" on the government's power to detain noncitizens pending removal proceedings pursuant to 8 U.S.C. § 1226(a). 978 F.3d at 855. The court reached this conclusion by conducting a ground-up procedural due process analysis, using the three-factor balancing test laid out by the Supreme Court in *Mathews*. *See Velasco Lopez*, 978 F.3d at 851. The court found the agency's bond procedures to be constitutionally inadequate for Mr. Velasco Lopez, who had been detained for over 14 months. 978 F.3d at 853. The proper remedy, the Second Circuit held, was a new bond hearing at which the government bore the burden of justifying continued detention by a clear and convincing standard of evidence. *Id.* at 855-56.

59. Though the court in *Velasco Lopez* did not reach the question of whether the government must *always* bear the burden of proof at bond hearings held under 8 U.S.C. § 1226(a), *id.* at 855 n.13, its analysis under *Mathews* makes clear that such protections are owed all persons seeking release under § 1226(a), regardless of the length of detention. *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 35-39 (1st Cir. 2021) (following the reasoning in *Velasco Lopez* and holding that due process requires the burden be placed on the government to prove dangerousness and flight risk for any petitioner detained under § 1226(a)). Moreover, even if the minimum requirements at § 1226(a) bond hearings are not susceptible to a general rule, the individual circumstances of J.D.D.A.'s particular case overwhelmingly favor heightened procedural protections.

60. *First*, the private interest affected by government action "is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). The *Velasco Lopez* court stressed that civil immigration detention bears substantial similarity to criminal detention, recognizing that "that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Id.* (citing *Jones v. U.S.*, 463 U.S. 354, 361 (1984)). Importantly, at the BFDF in Batavia, J.D.D.A. is "not 'detained,'" but rather "incarcerated under conditions indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes." *Id.* at 850; *see also Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015) (citing

*Hendricks*, 521 U.S. at 361) ("[M]erely calling a confinement 'civil detention' does not, of itself, meaningfully differentiate it from penal measures."), *overruled on other grounds by Jennings v. Rodriguez*, 138 S. Ct. 830 (2018); *accord Joseph v. Barr*, No. 19-CV-565, 2019 WL 3842359, at *5 (W.D.N.Y. Aug. 15, 2019) (finding conditions of confinement at the BFDF are "indistinguishable from penal confinement") (internal quotation marks omitted).

61.     Moreover, J.D.D.A.'s detention has already lasted over 22 months and is likely to continue for months or years. Indeed, J.D.D.A.'s removal proceedings were reopened following the government's intent to remove J.D.D.A. to a third country—Mexico—after he was already granted withholding of removal under the INA to El Salvador and the government waived appeal. As a result, J.D.D.A.'s removal proceedings have essentially reset back to step one. J.D.D.A. is now working on applying for protections against removal to Mexico, a country he has never known, before the IJ—a process that typically takes several months and could extend for years if either party appeals the IJ's decision to the BIA. ICE will continue to detain J.D.D.A. during the pendency of his reopened proceedings and any subsequent appeal. If the BIA dismisses J.D.D.A.'s appeal, he plans to petition for review before the U.S. Court of Appeals for the Second Circuit. If he succeeds in his agency appeal or petition for review resulting in remanded proceedings, he would then likely be required to present his merits case once again to an IJ. J.D.D.A. has already spent the entire duration of his initial removal proceedings in detention, has remained in immigration detention even after the IJ granted him relief from removal and beyond

the 90-day post-order detention period, and will continue to be detained in ICE custody indefinitely throughout ICE's attempts to remove J.D.D.A. to various third countries should this Court not intervene. Therefore, the first *Mathews* factor weighs heavily in J.D.D.A.'s favor. As the Second Circuit observed in *Velasco Lopez*, "[t]here is no administrative mechanism by which [J.D.D.A.] could have challenged his detention on the ground that it reached an unreasonable length." 978 F.3d at 852.

62. *Second*, the procedures imposed under BIA precedent lead to widespread, erroneous deprivation of noncitizens' rights. Here, the "primary interest is not that of the Government but the interest of the detained individual." *Velasco Lopez*, 978 F.3d at 852. And as the Second Circuit recognized, the procedures underpinning the detention of noncitizens held under § 1226(a) "markedly increased the risk of error." *Id.* "Requiring that detainees like [J.D.D.A.] prove that they are not a danger and not a flight risk—after the government has enjoyed a presumption that detention is necessary—presents too great a risk of an erroneous deprivation of liberty . . . ." *Black*, 103 F.4th at 156. As a result of the presumption that their detention is necessary, many noncitizens remain detained under § 1226(a) simply because they are unable to demonstrate their worthiness for release "to the satisfaction" of an IJ. *Matter of Guerra*, 24 I&N Dec. at 38. They are forced to prove negatives—that they are not dangerous or likely to abscond—and even when they present evidence of good character and domestic stability, IJs are permitted to resolve competing evidence against their favor. *See Hernandez-Lara*, 10 F.4th at 31 ("[P]roving a negative (especially a lack of danger) can often be more difficult than

proving a cause for concern."); *Elkins v. United States*, 364 U.S. 206, 218 (1960) ("[A]s a practical matter it is never easy to prove a negative.").

63.     In this case, the government's practice of placing the burden on the noncitizen greatly increased the risk of erroneous detention. Given the absence of other key safeguards, placing the burden on the government is essential to preventing an arbitrary and erroneous bond denial. *See Velasco Lopez*, 978 F.3d at 852-54 (noting, upon considering the risk of erroneous denial under current bond procedural framework, that the second Mathews factor "weighs heavily" in the noncitizen's favor).

64.     As in *Velasco Lopez*, the procedures afforded under BIA precedents "seriously impact[ed]" J.D.D.A.'s ability to secure bail. *Velasco Lopez*, 978 F.3d at 852. Like Mr. Velasco Lopez, J.D.D.A. was required to prove a negative—i.e., that that he was neither a danger nor a flight risk. *Id*. As a practical matter, detained noncitizens may be ill equipped to compile the evidence that they need for bond hearings. The current legal regime requires noncitizens to produce evidence on a range of issues, including criminal and immigration records, address history, length of residence, and family ties. *See Guerra*, 24 I&N Dec. at 40. The Supreme Court has noted that immigrant detainees "have little ability to collect evidence," *Moncrieffe v. Holder*, 569 U.S. 184, 201 (2013), and the Second Circuit recognized that these procedures "seriously impact" a noncitizen's ability to secure bail. *Velasco Lopez*, 978 F.3d at 852. Had the burden been on the government, ICE would have needed to provide affirmative evidence that J.D.D.A. posed a present danger, instead of pointing to

"temporally distant offenses." *Mathon v. Searls*, 623 F. Supp. 3d 203, 216 (W.D.N.Y. 2022). Indeed, in denying bond, the IJ implicitly faulted J.D.D.A. for not gathering more evidence, knowing that J.D.D.A. had limited resources and access to evidence as a detained *pro se* respondent. By contrast, placing the burden on the government to show dangerousness or flight risk would allow the government to deploy its substantial resources and existing pathways for sharing information across government agencies. As the Second Circuit recognized, "ICE and DHS can access the records of other federal agencies and local law enforcement and routinely do so for purposes of the merits proceedings." *Velasco Lopez*, 978 F.3d at 855. Thus, the second *Mathews* factor also favors J.D.D.A.

65. *Third*, the government would not suffer any undue fiscal or administrative hardship from bearing the burden of showing that J.D.D.A. poses a danger or flight risk that cannot be mitigated by reasonable conditions of supervision. To the contrary, the government has no interest in detaining noncitizens who are neither dangerous nor a flight risk but does have an interest in "minimizing the enormous impact of incarceration in cases where it serves no purpose." *Velasco Lopez*, 978 F.3d at 852; *see also Aparicio-Villatoro v. Barr*, No. 6:19-cv-06294-MAT, 2019 WL 3859013, at *6 (W.D.N.Y. Aug. 16, 2019) ("[T]he Court cannot discern any legitimate government interest, beyond administrative convenience, in detaining noncitizens generally while their immigration proceedings are pending and no final removal order has been issue[d]."). Indeed, should this Court order J.D.D.A.'s requested "due process hearing where the government b[ears] the burden of proof" then "the IJ

[must] consider alternatives before resorting to detention." *Mathon v. Searls*, 623 F. Supp. 3d 203, 217 (W.D.N.Y. 2022) (emphasis in original) (quoting *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 242 (W.D.N.Y. 2019) ("[W]hether detention is necessary to serve a compelling regulatory purpose requires consideration of whether a less restrictive alternative to detention . . . would also address those purposes.") (emphasis in original) (internal citations and quotations omitted)). Therefore, the third *Mathews* factor also weighs in favor of J.D.D.A.

66. Accordingly, J.D.D.A.'s due process and statutory rights were violated by the IJ's failure to place the burden of proof on the government at his July 17, 2024 bond hearing.

## B. Even If J.D.D.A.'s Original Bond Hearing Was Adequate, He Is Entitled to a New Bond Hearing that Comports with Due Process Due to His Prolonged Detention.

67. For the reasons set forth above, the placement of the burden on J.D.D.A. at his initial bond hearing was inconsistent with constitutional due process protections. But even if that burden placement were permissible at that time, it certainly cannot be justified now, in light of J.D.D.A.'s prolonged detention of over 22 months, with no clear end in sight. *See Velasco Lopez*, 978 F.3d 842 at 854 (finding that individuals subject to prolonged detention under § 1226(a) must be afforded process in addition to that provided by the ordinary bail hearing, and sanctioning new bond hearings for such individuals).

68. In *Velasco Lopez*, the Second Circuit cautioned that "detention under § 1226(a) is frequently prolonged because it continues until all proceedings and

appeals are concluded." *Id.* at 852. The Second Circuit recognized the Supreme Court's emphasis in *Demore v. Kim* that removal proceedings should be short, highlighting that Mr. Velasco Lopez's detention had far exceeded the average length of detention under § 1226(c) contemplated in *Demore*—a mere 1.5 months. *Id.* (*citing Demore v. Kim*, 538 U.S. 510, 529 (2003); *see also*, *Cantor v. Freden*, 761 F. Supp. 3d 630, 635 (W.D.N.Y. 2025) (finding that petitioner's detention far exceeded the 1.5 months of detention for removal proceedings and four months of detention for a BIA appeal that the Supreme Court had considered in *Demore*); *Tapia Lopez v. Garland*, No. 22-CV-39-LJV, 2022 WL 3009530, at *4 (W.D.N.Y. July 29, 2022) (finding that 13 months of detention was unduly prolonged as it "far exceeds the four-month average cited in *Demore*"). Accordingly, the Second Circuit used the *Mathews* factors to reach the conclusion that an individual who faced prolonged detention was entitled to a bond hearing where the government bore the burden of proof by clear and convincing evidence. *See Velasco Lopez*, 978 F. 3d at 856.

69.    Under Second Circuit case law, J.D.D.A.'s detention of over 22 months has far surpassed the point where heightened procedural protections are necessary. *Velasco Lopez*, 978 F.3d at 855 n.13 (noting that "a presumptively constitutional period of detention does not exceed six months" (citing *Zadvydas*, 533 U.S. at 701)); *Black*, 103 F.4th at 151-52, 157-58 (2d Cir. 2024) (concluding that seven months was sufficiently lengthy to trigger special protections against arbitrary detention, including a bond hearing where ICE had to bear the burden by clear and convincing evidence, in the mandatory detention context). And, "as the period of confinement

grows, so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention." *Velasco Lopez*, 978 F.3d at 855 (citing *Zadvydas*, 533 U.S. at 701) (internal quotations omitted). Therefore, applying the same *Mathews* factors to the government's detention of J.D.D.A., *see supra* Section I.A., leads to the same result here as in *Velasco Lopez*, where the petitioner had been detained for 14 months.

70.     Accordingly, J.D.D.A.'s detention has become unconstitutionally prolonged, warranting a new bond hearing at which the government must bear the burden of proving, by clear and convincing evidence, that J.D.D.A. is a danger or flight risk.

### C. Due Process Requires that the Government Analyze J.D.D.A.'s Ability to Pay and Alternative Means of Assuring Appearance When Assessing Flight Risk and Dangerousness and Setting a Bond Amount.

71.     Due process also requires consideration of alternatives to detention and a noncitizen's ability to pay bond.

72.     Immigration detention must bear "reasonable relation to the purpose for which the individual [was detained]." *Zadvydas*, 533 U.S. at 690. The government's only legitimate interests here are in "ensuring the appearance of [noncitizens] at future immigration proceedings" and "[p]reventing danger to the community." *Id*. If a reasonably affordable bond amount or some less-restrictive alternative condition could vindicate the government's interest in assuring an individual's appearance at future immigration proceedings and mitigating any danger to the community, then to continue to incarcerate them regardless is a needless deprivation of their liberty.

Detention, particularly prolonged detention, is not reasonably related to this purpose if there are alternative conditions of release that could mitigate risk of flight or danger. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979); *see also Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017) (observing that alternatives to detention "resulted in a 99% attendance rate at all EOIR hearings and a 95% attendance rate at final hearings"). It follows that—in determining the appropriate conditions of release for immigration detainees—due process requires "consideration of financial circumstances and alternative conditions of release" to prevent against detention based on indigence. *Id.; see also Hechavarria*, 358 F. Supp. 3d at 242 (holding that it was legal error to refuse to consider alternative conditions of release proposed by a detained noncitizen during his bond hearing).

73.     Furthermore, failure to consider ability to pay when setting a bond amount "creates a serious risk that the noncitizen will erroneously be deprived of the right to liberty purely for financial reasons." *Black*, 103 F.4th at 158. An IJ's purpose when setting a specific bond amount is to produce a sufficient incentive for the detainee to appear at future proceedings. *Hernandez*, 872 F.3d at 991. This calculation must depend in part on the noncitizen's financial circumstances, as the amount of bond needed to disincentivize flight for an indigent individual is less than that for a wealthy individual. *Id.*

74.     Whether due process requires consideration of ability to pay and alternatives to detention was absent from the Second Circuit's decision in *Velasco Lopez* only because the issue was not addressed by the court below. *See* Corrected Br.

for Pet'r, *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020); *Velasco Lopez*, 978 F.3d 842; *Velasco Lopez v. Decker*, No. 19-cv-2912 (ALC), 2019 WL 2655806 (S.D.N.Y. May 15, 2019). However, the Second Circuit recently held in *Black* that the district court had properly required the IJ to consider the noncitizen's ability to pay and alternatives to detention during a constitutionally mandated bond hearing. 103 F.4th at 158. The court employed the *Mathews* three-factor balancing test and was guided by the touchstone that detention must be reasonably related to a legitimate government interest. *Id.* Although *Black* was detained under 8 U.S.C. § 1226(c), the court's reasoning under the *Mathews* test applies with equal force to noncitizens like J.D.D.A. detained under 8 U.S.C. § 1226(a).

75.     Although *Black* did not settle whether IJs must always consider ability to pay and alternatives to detention, the decision is consistent with the emerging consensus in this District that due process categorically requires IJs to consider these factors in any immigration bond hearing. *See e.g.*, *Cantor*, 761 F. Supp. 3d at 635 (finding that due process "requires a neutral decisionmaker to address whether alternatives to detention might ameliorate risk of danger as well as risk of flight); *Davis v. Garland*, No. 22-CV-443-LJV, 2023 WL 1793575, at *6 (same); *Vazques v. Garland*, No. 1:21-CV-00477-EAW, 2022 WL 2467655, at *4 (W.D.N.Y. July 6, 2022) (same); *see also Balogun v. Wolf*, No. 20-CV-6574-FPG, 2020 WL 13553495, at *7 (W.D.N.Y. Dec. 3, 2020); *Thomas v. Barr*, No. 20-CV-6362-FPG, 2020 WL 5760823, at *3 (W.D.N.Y. Sept. 28, 2020); *Hechavarria*, 358 F. Supp. 3d at 242. At least one circuit court has reached the same conclusion. *See Hernandez*, 872 F. 3d at 991-94.

These decisions recognize that a "bond determination process that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests." *Id.* at 991.

76.     To adequately vindicate J.D.D.A.'s constitutional due process rights, at a new bond hearing the IJ must be required to analyze the mitigative impact that ability to pay or alternative conditions of release may have on flight risk and danger to the community. The IJ must also consider ability to pay when setting a bond amount.

## II.    The Agency's Decision to Place the Burden of Proof on J.D.D.A. Constitutes Arbitrary and Capricious Agency Action.

77.     The burden allocation applied to J.D.D.A.'s bond hearing represents a sharp reversal from decades of contrary agency precedent. A cornerstone of administrative law is that when an agency changes policy, it must offer a reasoned explanation for that change. *See F.C.C. v. Fox Television Stations, Inc. ("Fox TV")*, 556 U.S. 502, 515 (2009). At a minimum, a reasoned explanation requires that the agency "display awareness that it is changing position" and that "there are good reasons for the new policy." *Id.* In adopting the burden allocation set forth in *Matter of Adeniji*, thereby abandoning its longstanding placement of the burden to justify detention on the government, the BIA failed to comply with the requirements of *Fox TV*, and thus took arbitrary and capricious action that must be set aside.

78.     Until 1999, the government interpreted its general detention authority under 8 U.S.C. § 1226(a)—and that provision's statutory precursor, 8 U.S.C.

§ 1252(a)(1)—to contain a presumption of release. *See generally Velasco Lopez*, 978 F.3d at 848; *Hernandez-Lara*, 10 F.4th at 26; Mary Holper, *The Beast of Burden in Immigration Bond Hearings*, 67 Case Western Res. L. Rev. 75, 81-95 (Fall 2016).

79. For instance, in 1976, the BIA issued *Matter of Patel*, holding that a noncitizen "generally is not and should not be detained or required to post bond except on a finding that he is a threat to national security . . . or that he is a poor bail risk." 15 I&N Dec. 666, 666 (BIA 1976). Because the BIA required a positive finding that a noncitizen "*is* a poor bail risk" in order to detain him (rather than a negative finding that he is *not* a bail risk in order to release him), *Matter of Patel* placed the burden squarely on the government. *See also Matter of Kwun*, 13 I&N Dec. 457, 464 (BIA 1969); *Matter of Au*, 13 I&N Dec. 133, 137-38 (BIA 1968); *Matter of Andrade*, 19 I&N Dec. 488, 489 (B.I.A. 1987); *Matter of Shaw*, 17 I&N Dec. 177, 178 (BIA 1979); *Matter of Spiliopoulos*, 16 I&N Dec. 561, 563 (BIA 1978).

80. In the late 1980s and early 1990s, Congress evinced an awareness of this long-standing agency practice when it enacted a series of amendments creating a statutory carve-out for noncitizens with aggravated felony convictions, requiring those individuals to bear the burden of proof at their bond hearings to show that they merited release, but leaving intact the *Patel* framework for all other persons. *See Demore*, 538 U.S. at 520-21 (discussing history); Miscellaneous and Technical Immigration and Naturalization Amendments, Pub. L. 102-232, § 306(a)(4) (1991), codified at 8 U.S.C. § 1252(a)(2)(B) (1992). And when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996,

expanding the aggravated felony carve-out to include a broader set of triggering convictions and adopting a strict rule mandating detention for these so-called "criminal aliens" for the pendency of their removal proceedings, it again chose not to alter the *Patel* framework for persons in discretionary detention. Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996); *see* 8 U.S.C. § 1226(c) (1996).[3]

81. In 1999, however, the Board issued *Matter of Adeniji*, in which it flipped the burden allocation framework, instead requiring that to merit release from detention, a person held under § 1226(a) must "show that he is not likely to abscond, is not a threat to the national security, and is not a threat to the community." 22 I&N Dec. at 1112.

82. In *Matter of Adeniji*, the BIA evinced no recognition that it was abrogating the longstanding burden allocation that the agency had adopted in *Matter of Patel* and had subsequently reaffirmed in a series of decisions. *See Matter of Adeniji*, 22 I&N Dec. at 1111-13. And in 2006, when the BIA in *Matter of Guerra* reaffirmed *Adeniji's* holding to all § 1226(a) bond hearings, it again did not acknowledge, much less grapple with, the reversal of the agency's longstanding burden allocation. Nor has the BIA offered any acknowledgement of this about-face

---

[3] Individuals subject to mandatory detention under Section 1226(c) are eligible for release only if their release is necessary for the protection of a cooperating witness or their family, and if the individual "satisfies the Attorney General that the [noncitizen] will not pose a danger . . . and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2). In enacting this limited carveout for mandatory detention, Congress once again demonstrated that it knew how to place the burden on the noncitizen when it wanted to. There is no comparable language in § 1226(a).

in its subsequent precedential decisions on this issue. *See, e.g.*, *Matter of Urena*, 25 I&N Dec. at 141; *Matter of Fatahi*, 26 I&N Dec. at 793; *Matter of Siniauskus*, 27 I&N at 207.

83.     Not only has the agency not acknowledged that it has changed its policy *sub silentio*, but it has also failed to offer "good reasons for the new policy." *Fox TV*, 556 U.S. at 515. In *Adeniji*, the BIA relied primarily on a former Immigration and Naturalization Service ("INS") regulation, 8 C.F.R. § 236.1(c)(8), to justify the new burden allocation. Even though the regulation governed the standards for initial, post-arrest custody decisions made by arresting officials, not IJs, the BIA stated— without explanation—that it "contain[s] the appropriate test, as it is binding on us and pertains directly to removal proceedings under the IIRIRA." 22 I&N Dec. at 1113; *see also id.* at 1103 (describing the regulation as "controlling").

84.     The BIA was simply wrong to find the regulation "binding," as it plainly did not apply to IJs. To the extent the BIA relied on an "erroneous view of the law" in *Adeniji*, that reliance would not constitute an adequate basis to justify a policy change. *Sea-Land Serv., Inc. v. Dep't of Transportation*, 137 F.3d 640, 646 (D.C. Cir. 1988) ("An agency action, however permissible as an exercise of discretion, cannot be sustained where it is not based on the agency's own judgment but on an erroneous view of the law.") (citations and internal quotation marks omitted).[4] Nor was stating

---

[4] A related legal flaw in the agency's analysis is its failure to grapple with the constitutional implications of its burden allocation. The Board had an opportunity to interpret § 1226(a) to avoid a constitutional problem in *Adeniji*, but instead flipped the *Patel* presumption of freedom without considering any due process implications. *See* 22 I. & N. Dec. at 1102; *see also id.* at 1123 (Rosenberg, Board member,

without explanation that the regulation "contain[s] the appropriate test" sufficient. The BIA's conclusory analysis on this score cannot satisfy its obligation to explain its actions. *See New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 85 (2d Cir. 2020).

85.     Finally, the BIA's analysis in *Adeniji* was also unreasonable because it failed to acknowledge that Congress enacted § 1226(a) in 1996 with the benefit of the BIA's consistent application of a presumption against detention under §1252(a)'s virtually identical language. In doing so, the BIA ignored the "presump[tion]" that "Congress is . . . aware of an administrative or judicial interpretation of a statute and [adopts] that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d at 82 (agency policy arbitrary and capricious in part because the "agency justification [] is unmoored from the nuanced views of Congress").

86.     In J.D.D.A.'s bond proceedings, the IJ relied on the BIA's precedential decisions following *Adeniji* to hold that the burden fell on him rather than the government. *See supra* ¶¶ 36-38. The government's failure to provide J.D.D.A. with a bond hearing in which it bore the burden of proof, therefore, constitutes arbitrary and capricious action.

---

dissenting) ("While the Board may not decide the constitutionality of a statute, we do have the duty to render our decisions in a manner that will avoid constitutional questions.").

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

87.     The government has detained J.D.D.A. without providing him a bond hearing at which the government bears the burden of proof to justify continued detention by proving by clear and convincing evidence that he is a danger to others or a flight risk. The government has not proven by clear and convincing evidence that J.D.D.A. is a danger or flight risk.

88.     The government has also not proven that no condition or combination of conditions will reasonably assure J.D.D.A.'s future appearance and/or the safety of the community.

89.     The government's conduct violates J.D.D.A.'s Fifth Amendment right to due process.

### COUNT TWO: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

90.     The BIA decision establishing the present burden allocation, *Matter of Adeniji*, 22 I&N Dec. 1102 (BIA 1999), constituted an unreasonable departure from prior agency precedents without reasoned explanation.

91.     The government's application of that unlawful burden allocation to J.D.D.A.'s case violates the Administrative Procedure Act's prohibition on arbitrary and capricious agency action.

## **PRAYER FOR RELIEF**

WHEREFORE, J.D.D.A. respectfully requests that the Court:

1) Assume jurisdiction over this matter;

2) Enjoin the government from transferring him outside the jurisdiction of the Buffalo Field Office pending the resolution of this case;

3) Issue a writ of habeas corpus directing Respondents to immediately release J.D.D.A. from custody unless they provide him with a constitutionally adequate, individualized hearing within fourteen days before an impartial adjudicator. At that hearing:

   a. ICE must bear the burden of establishing by clear and convincing evidence that continued detention is justified;

   b. The adjudicator must meaningfully consider the least restrictive alternatives to detention sufficient to vindicate the government's interest in assuring J.D.D.A.'s appearance at future immigration proceedings and mitigate any dangerousness concerns; and

   c. The adjudicator must meaningfully consider J.D.D.A.'s ability to pay if setting a monetary bond.

4) Award J.D.D.A. his costs and reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

5) Grant such further relief as the Court deems just and proper.

Dated: October 8, 2025      Respectfully submitted,

*/s/ Sayoni Maitra*
Sayoni Maitra
THE LEGAL AID SOCIETY
Immigration Law Unit
49 Thomas St., 5th Floor
New York, NY 10013
Tel: 929-656-1667
Email: smaitra@legal-aid.org

*Counsel for Petitioner*

## **VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I am submitting this verification on behalf of J.D.D.A. because I am one of his attorneys at The Legal Aid Society and have reviewed his case materials and communicated with the other attorneys on his case. On information and belief, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated: October 8, 2025                Respectfully submitted,

*/s/ Sayoni Maitra*
Sayoni Maitra
THE LEGAL AID SOCIETY
Immigration Law Unit
49 Thomas St., 5th Floor
New York, NY 10013
Tel: 929-656-1667
Email: smaitra@legal-aid.org

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2025, I filed this Petition for a Writ of Habeas Corpus with all supporting papers with the Clerk of the U.S. District Court for the Western District of New York using its CM/ECF system. By rule, habeas petitions filed with the Clerk of the District Court are electronically served through the Court's CM/ECF system on the following respondents on this case:

- Stephen Kurzdorfer, in his official capacity as Acting Field Office Director, Buffalo Field Office, U.S. Immigration and Customs Enforcement;
- Joseph Freden, in his official capacities as Deputy Field Office Director, Buffalo Field Office, U.S. Customs and Immigration Enforcement, and Administrator, Buffalo Federal Detention Facility;
- Todd M. Lyons, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement;
- Kristi Noem, in her official capacity as Secretary of the U.S. Department of Homeland Security;
- Daren K. Margolin, in his official capacity as Director, Executive Office for Immigration Review, U.S. Department of Justice; and
- Pamela Bondi, in her official capacity as Attorney General of the United States.

Dated: October 8, 2025                    Respectfully submitted,

_/s/ Sayoni Maitra_
Sayoni Maitra
THE LEGAL AID SOCIETY
Immigration Law Unit
49 Thomas St., 5th Floor
New York, NY 10013
Tel: 929-656-1667
Email: smaitra@legal-aid.org

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

J.D.D.A.

**(b)** County of Residence of First Listed Plaintiff   Genesee
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Sayoni Maitra, The Legal Aid Society, 49 Thomas St., 5th Floor, New York, NY 10013; (929) 656-1667

## DEFENDANTS

Stephen KURZDORFER; Joseph FREDEN; Todd M. LYONS; Kristi NOEM; Daren K. MARGOLIN; Pamela BONDI;

County of Residence of First Listed Defendant   Genesee
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)
Michael DiGiacomo, U.S. Attorney's Office, Western District of New York, 138 Delaware Ave., Buffalo, NY 14202; (716) 843-5700

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☒ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 2241

Brief description of cause:
Petitioner challenges his detention by U.S. Immigration and Customs Enforcement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE
10/08/2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Sayoni Maitra

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## DECLARATION OF SHAYNA SCOTT IN SUPPORT OF
## J.D.D.A.'S PETITION FOR WRIT OF HABEAS CORPUS

I, Shayna Scott, an attorney duly admitted to practice law in the Commonwealth of Massachusetts, declare under penalty of perjury to 28 U.S.C.A. § 1746 that the following is true and correct to the best of my knowledge.

### *Background*

1. My name is Shayna Faye Scott. I am a staff attorney with The Legal Aid Society's Immigration Law Unit. I represent J.D.D.A. in his immigration removal proceedings that are before the Batavia Immigration Court ("Immigration Court"). J.D.D.A. is currently detained in the custody of U.S. Immigration and Customs Enforcement ("ICE") at the Buffalo Federal Detention Facility in Batavia, New York ("Batavia"). He was transferred there from the Moshannon Valley Processing Center ("Moshannon") in April 2025.

2. J.D.D.A. was born in San Miguel, El Salvador in 1995. He and his younger brother were raised by a single mother, until she left for the United States when he was around nine years old. J.D.D.A. came to the United States when he was about 11 years old after MS-13 gang members threatened him and his family because he would not join their ranks.

3. After arriving in the United States in 2007, J.D.D.A. lived in different housing arrangements in New York—first with his grandmother on Long Island, then with his mother and her uncle in Queens. He moved around between various schools.

4. When J.D.D.A. was a teenager, his mother revealed that she had been raped around the age of thirteen years old by gang members, leading to J.D.D.A.'s conception. J.D.D.A. struggled with feelings of guilt, grief, and helplessness thereafter.

5. J.D.D.A. spent increasing time away from his family's home and turned to substance use to avoid thinking about what had happened to his mother. He was arrested several times as a young adult for property-related offenses like petit theft and disorderly conduct when he was under the influence. During the COVID-19 pandemic J.D.D.A. suffered the loss of his great grandmother who had raised in El Salvador.

6. J.D.D.A.'s final arrest was in May 2022 where he faced potential jail time, over just a few days, for the first time. He was arrested for stealing a car from a parking lot and faced with the most serious charges he had encountered to date. This sobering experience pushed him to return to the rehabilitation center in July 2022. He left rehab to attend his criminal court hearings and was ultimately sentenced to 364 days of jail time. J.D.D.A. has now been sober for three years.

*Removal Proceedings in Immigration Court*

7. Upon his release from criminal custody in November 2023, J.D.D.A. was taken into ICE custody. On November 8, 2023, ICE filed a Notice to Appear charging J.D.D.A. as inadmissible. Upon his arrest, J.D.D.A. was shocked to learn that he had been labeled by ICE as an MS-13 gang member. When ICE officers

arrived at the county jail to transport him, he overheard ICE officers discussing how to separate him from another detainee in their van, who was allegedly part of the 18th Street gang. He later received a copy of his I-213, stating that he was a "associate/active of M.S. 13" and a "member of MS-13 gang." J.D.D.A. has never been a part of any gang group and vehemently opposes them, given the past trauma that he, his mother, and other family members suffered at the hands of gang members.

8. J.D.D.A. represented himself in his removal proceedings from November 2023 until around September 2024. He advocated for the removal of the erroneous gang label but received no response to his requests. During his *pro se* appearance, the Immigration Judge ("IJ") designated El Salvador as the sole country of removal. He filed a *pro se* Form I-589, Application for Asylum, Withholding of Removal and Protection under the Convention Against Torture on April 18, 2024, which was amended in October 2024. He also represented himself *pro se* at a bond hearing on July 17, 2024 in which the IJ denied bond.

9. On September 17, 2024, J.D.D.A. retained The Legal Aid Society as counsel to represent him during his removal proceedings.

10. On February 21, 2025, the IJ granted J.D.D.A.'s application for statutory withholding of removal from El Salvador based on his fear of death or torture at the hands of the Salvadoran government during the ongoing State of Exception, given his erroneous gang label, criminal history, and potential future deportee status. The Department of Homeland Security ("DHS")

ultimately agreed it would not appeal a grant of withholding of removal, rendering the IJ's decision immediately final.

11. In spite of the grant of immigration relief, J.D.D.A. remained detained post-order in Moshannon and then Batavia. In early May 2025, through counsel, he provided a detailed response and packet of evidence in support of his 90-day ICE custody review, including: letters of support from family members, friends, and his social worker; proof of the rehabilitation programs he had completed; and certificates for coursework and volunteer work he completed while in ICE detention. J.D.D.A.'s counsel repeatedly tried to contact the Deportation Officer assigned to J.D.D.A.'s case, Officer Brandon Smith, throughout May 2025 but did not receive any communication from him until May 27, 2025. At that time, Officer Smith informed counsel that ICE would review J.D.D.A.'s evidentiary submission that week. One day later, on May 28, 2025, ICE issued a decision declining to release J.D.D.A.   at the 90-day custody review. J.D.D.A.'s counsel immediately submitted a request for an in-person 180 day interview with ERO's removal division, but never received a response.

12. J.D.D.A. would have had a 180-day ICE custody review on August 20, 2025. However, on June 23, 2025, J.D.D.A.'s deportation officer emailed me a notice advising me that DHS intends to remove J.D.D.A. to Mexico, a country to which he has no connection. I confirmed with J.D.D.A. that he is afraid to be deported to Mexico due to his erroneous MS-13 gang label, his status as a deportee with criminal history, and his lack of ties to Mexico. I filed an

emergency stay and motion to reopen immigration court removal proceedings on June 26, 2025.

13. The IJ granted the emergency stay on June 26, 2025. The IJ subsequently granted the motion to reopen proceedings on July 17, 2025, after DHS filed no objection.

14. J.D.D.A. is now scheduled for an individual merits hearing regarding his fear of removal to Mexico on October 27, 2025.

*Detention Issues*

**A.** *Health Issues*

15. J.D.D.A. has been detained since November 8, 2023. He has now spent 23 months in ICE custody, longer than he has been detained for any criminal matter.

16. J.D.D.A. has struggled with his mental health since the outset of his detention, as he was denied access to mental health medication (i.e. Seroquel) that he previously took during his one-year criminal sentence. While in ICE detention, he has limited access to psychiatric treatment and counseling.

17. J.D.D.A. has told me many times since he was granted withholding of removal in February 2025 that the uncertainty of his situation has been very difficult. Neither he nor I were given any information about ICE's efforts to effectuate a third country removal for four months, until J.D.D.A. and I received a notice of intent of removal to Mexico on June 23, 2025.

18. J.D.D.A.'s immigration removal proceedings have now been reopened and he is scheduled for an individual hearing on October 27, 2025. However, even if he is granted withholding of removal to Mexico, DHS may designate additional countries for potential removal. J.D.D.A. has the right to seek protection from removal to any country where he fears persecution or torture and due process requires that he receive a fundamentally fair removal proceeding in any such case. Therefore, if DHS designates additional countries, J.D.D.A. could face years of removal proceedings while detained. Additionally, if J.D.D.A. is denied withholding of removal to Mexico or another country, he has the right to appeal to the Board of Immigration Appeals or file a petition for review with the Circuit Court of Appeals. This uncertain and protracted process weighs heavily on J.D.D.A.

19. J.D.D.A. has also suffered serious injuries while detained. Around October 2024, J.D.D.A injured his left ankle. Two months passed before he was scheduled for an MRI and doctor's appointment outside Moshannon. He was diagnosed with interior and exterior ligament damage and a partial tendon tear to his left ankle. He was prescribed physical therapy, but it took months before Moshannon provided him with appointments. He attended approximately three before J.D.D.A. was transferred to Batavia and had to start the process again. After one month at Batavia, J.D.D.A. was taken to an orthopedist and his left ankle was finally placed in a cast.

20. In March 2025, shortly before he was transferred to Batavia, he injured his right ankle, which became swollen. He was unable to see an orthopedist before his transfer.

21. At Batavia, J.D.D.A. was given inadequate supplies to protect the cast on his left ankle. He asked for a waterproof cover for his cast while he showered but was given only a small plastic bag. As a result, the cast broke soon after he returned from the orthopedist. J.D.D.A. asked for help removing the broken cast, as the jagged pieces were digging painfully into his foot. He was told to wait 1.5 months for the next orthopedist appointment and given some tape. He ultimately had to remove the cast himself.

22. Around June 2025, J.D.D.A. returned to the orthopedist without his cast. He was again prescribed physical therapy and told that he may need another MRI. As of today, J.D.D.A. has still never attended a physical therapy appointment or received an MRI while at Batavia. J.D.D.A. has also not received any further treatment for his right ankle, despite his requests.

**B.** *Legal Access Issues*

23. Since his transfer to Batavia, it has been difficult to work with J.D.D.A. on his legal case. J.D.D.A. had previously been able to fax and send documents pertaining to his legal case to me as his attorney. In a recent policy change, detainees at Batavia are now only able to send faxes during video call appointments with their attorneys; faxing is not available at any other time.

24. This policy change coincided with the implementation of a new video legal call system. Instead of emailing Batavia's Virtual Attorney Visitation Program Officer directly as before, all legal calls must now be scheduled through a website called ERO eFile. However, J.D.D.A. was not in the ERO eFile system; his name, "alien registration number," date of birth, and country of origin all produced a "no matching subject" error message. It took three weeks for Batavia to address this issue. During that time, it was extremely difficult to communicate with J.D.D.A.

25. Moreover, J.D.D.A. was not produced for his own immigration court appearance during this time. On July 30, 2025, J.D.D.A. was scheduled for a master calendar hearing via WebEx at the Elizabeth Immigration Court. Despite several calls and emails that I and my co-counsel, Margaret Min, Esq., made before and during the hearing, J.D.D.A. was never produced. We ultimately had to proceed before the immigration judge without J.D.D.A. present, to avoid delaying his case.

26. J.D.D.A.'s pending case has been rescheduled, adjourned, and transferred between Immigration Judges multiple times in September 2025. J.D.D.A. was initially scheduled for an Individual Hearing before IJ Bailey at the Elizabeth Immigration Court on September 30, 2025. On August 27, 2025, I received notice that the merits hearing had been advanced to September 18, 2025, before IJ Shirole, resulting in a September 4, 2025, deadline for evidence which would leave me with only X business days to complete the filing. I immediately

filed a motion for a continuance, as I had planned, international travel starting September 4, 2025, and could not ethically meet the advanced case deadline. We had also retained a country conditions expert, who could not meet the advanced deadline. IJ Shirole granted the continuance on September 4, 2025. While I was out of the country, The Legal Aid Society received a notice on September 9, 2025, that J.D.D.A. was now scheduled for an Individual Hearing on September 24, 2025, before IJ Rubenstein, with an evidentiary deadline on September 10, 2025 (one day after the hearing notice was issued). My supervising attorney, Dan Smulian, Esq., filed a motion for a continuance on September 10, 2025. The same day, IJ Rubenstein issued an order finding the motion for continuance moot because DHS had filed a Form I-830, Notice to EOIR: Alien Address for Buffalo, New York, where J.D.D.A. had been detained since April 2025. By filing this form five months after J.D.D.A.'s transfer to Buffalo, J.D.D.A.'s case was transferred to the Batavia Immigration Court. On September 17, 2025, I received notice of a Master Calendar Hearing on September 22, 2025, before IJ Harbeck of the Batavia Immigration Court. At that hearing, J.D.D.A. was set for an Individual Hearing on October 27, 2025 (a month after his initially scheduled Individual Hearing date).

*Exhibits*

27. Attached as Exhibit A is a true and correct copy of J.D.D.A.'s Declaration in Support of His Petition for Writ of Habeas Corpus, dated September 23, 2025.

28. Attached as Exhibit B is a true and correct copy of the Declaration of Karla in Support of J.D.D.A.'s Writ of Habeas Corpus, dated August 14, 2025.

29. Attached as Exhibit C is a true and correct copy of the Declaration of Emilio in Support of J.D.D.A.'s Writ of Habeas Corpus, dated August 8, 2025.

30. Attached as Exhibit D is a true and correct copy of the Letter of Marlon Agustin-Mendez, LMSW, dated September 18, 2025.

31. Attached as Exhibit E is a true and correct copy of Immigration Judge Bailey's Order Granting Withholding of Removal, dated February 21, 2025.

32. Attached as Exhibit F is a true and correct copy of Immigration Judge Bailey's Order Denying Bond, dated July 17, 2024.

33. Attached as Exhibit G is a true and correct copy of DHS's Decision to Continue Detention, dated May 28, 2025.

34. Attached as Exhibit H is a true and correct copy of excerpts from J.D.D.A's ICE Medical Records.

35. Attached as Exhibit I is a true and correct copy of ICE's Notice of Removal to Mexico dated June 23, 2025.

36. Attached as Exhibit J is a true and correct copy of Immigration Judge Bailey's Order Granting an Emergency Stay of Removal, dated June 26, 2025.

37. Attached as Exhibit K is a true and correct copy of Immigration Judge Bailey's Order Granting J.D.D.A's Motion to Reopen, dated July 17, 2025.

WHEREFORE, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/ Shayna Scott                              9/23/2025
Shayna Scott                                  Date

# EXHIBIT  A

EXHIBIT  A

## DECLARATION OF J.D.D.A.
## IN SUPPORT OF HIS WRIT OF HABEAS CORPUS

I, J.D.D.A., make this declaration under penalty of perjury to 28 U.S.C.A. § 1746:

*Background*

1. My name is J.D.D.A. I was born in 1995, in El Salvador. I came to the United States in 2007, when I was around 11 years old. I left El Salvador out of fear for me and my brother Emilio's safety and to avoid gang recruitment. The MS-13 gang members where I lived in San Miguel had threatened me, saying they would hurt me and my family if I did not join them.

2. In the U.S., I reunited with my mom around 2007. She had left El Salvador for the United States years before me and my brother. When I was older, I learned it was because she had been sexually assaulted by gang members when she was just 13 years old in El Salvador, which is how I was born.

3. Life in the United States was not easy. I did not speak any English when I arrived. We moved to different homes in Queens and Long Island, New York so I had to switch schools several times. When I was around 16 years old, I learned that I was born the product of rape of my mother, and I couldn't erase the thought from my mind. I would look at myself in the mirror and remember I was born because of rape. It made me feel miserable and guilty, like I shouldn't exist. To cope, I left home and turned to drinking and drugs and was arrested a number of times.

4. After my arrest in May 2022, I tried to get sober with the help of a free rehab program called the Corona Self-Help Center. I completed three months of the

program and wanted to finish the entire voluntary program. I have now been sober since October 2022—almost three years. I did several personal growth programs during my jail sentence, including attending an outside bible study program called Crossroads, taking college courses at the Suffolk County learning center, and joining group therapy meetings every day. When I finished my 364 days in jail, instead of being released, I was sent to ICE custody.

### *Removal Proceedings and Application for Asylum and Related Relief*

5. I have been in ICE custody since November 8, 2023. Initially, I thought that my immigration detention and removal proceedings might be good for me because, if granted relief, I could have the opportunity to lawfully stay in the United States.

6. I immediately started contacting pro bono lawyers to help me with my case. Unfortunately, even though I contacted multiple *pro bono* organizations, I was not able to find an attorney until September 2024. So, from November 2023 to September 2024, I appeared *pro se* for all my court dates before Immigration Judge Bailey at the Elizabeth Immigration Court, including my bond hearing.

7. Soon after I arrived in ICE custody, I learned that U.S. immigration authorities had labeled me as member or affiliate of the MS-13 gang. My heart sank, and I was in disbelief. Not only am I not a member or affiliate of the MS-13 gang, I had actually fled El Salvador because I feared torture and death at the hands of MS-13 members and other gangs. I am heavily opposed to gangs,

especially knowing that my own mother was raped by gang members when she was so young. I repeatedly told immigration authorities and the IJ during my hearings before IJ Bailey that I would never be a part of the MS-13 gang or any similar organization.

8. Before I was detained by ICE, I did not know very much about the State of Exception in El Salvador. Because I did not have a lawyer, I started reading various cases and reports. I quickly learned that the Salvadoran government is targeting people like me, with gang labels or criminal history, and subjecting them to the State of Exception. In addition to my fear of MS-13 members and rival gangs in El Salvador, I became terrified that the Salvadoran government would arrest, detain, torture, and even kill me, if I were deported to El Salvador, because of my criminal history in the U.S. and my erroneous label as an MS-13 member by U.S. law enforcement. Based on these fears, I filed a *pro se* Form I-589 application for asylum, withholding of removal, and relief under the Convention Against Torture around April 2024. On April 24, 2024, I appeared before IJ Bailey and repeated that I had been wrongfully labeled an MS-13 member. The IJ then set me for an individual merits hearing for August 2024. I submitted as much as I could for my IH but I had to ask the IJ for more time because I was struggling to gather evidence, submit my applications, and write a legal argument on my own.

9. Around mid-September 2024, I was able to get free attorneys from The Legal Aid Society to represent me in my case. It was really difficult for me to proceed

without an attorney because it was nearly impossible to get evidence while I was detained, and I had to ask the IJ for additional time to file evidence by the court's deadlines. With the attorneys' help, I was able to win my case. Immigration Judge Bailey granted me withholding of removal from El Salvador in February 2025, and the government did not appeal.

10. I was relieved and hoped that I would be released from detention soon. I waited for release and tried to use the time as best as I could, helping other detainees without attorneys translate documents and prepare their cases. But at my 90-day custody review, I still was not released. I kept waiting. Then on June 23, 2025, someone slipped a notice under my door, that said that ICE intended to remove me to Mexico. The notice had my name at the top but the certificate of service at the bottom listed someone else's name. No one spoke to me about the notice, and I have never met my deportation officer in person. I immediately sent a copy to my attorneys because I am afraid to be sent to Mexico.

*Attempts to Secure Release from ICE Custody*

11. I have been in ICE custody since November 8, 2023. I was initially detained at Orange County Jail in Goshen, New York, for about ten days. I was then transferred to Moshannon Valley Processing Center (Moshannon) in Pennsylvania until April 2025. Then, I was sent to the Buffalo Federal Detention Facility in Batavia, New York even though my immigration case was over by then.

12. Back in 2024, after months of trying to find an attorney, I knew I needed to ask for a bond hearing even without a lawyer. My family was struggling emotionally, financially, and mentally without me, and I could not shake this feeling of constant guilt that I couldn't be there for them. I tried to orally ask the IJ for a bond hearing in January and April 2024, but the IJ told me I had to submit a written request with evidence. I put together the best *pro se* bond packet that I could from detention, asking people outside of detention to write letters and help me get documents. I was finally able to submit my request around June 28, 2024. The Immigration Judge reviewed the evidence and asked me about my criminal history and whether I was an MS-13 member. I answered as truthfully as I could, and again, denied that I had ever been a member of any gang. Unfortunately, the Immigration Judge denied my bond request on July 17, 2024. He found that I didn't show I was not a danger to the community, even though I had submitted letters of support and evidence of my rehabilitation, my strengthened relationships to my family and my faith, and the coursework I completed while in custody. I had until August 16, 2024, to appeal the IJ's bond denial, but I missed the deadline because I couldn't finish my bond appeal while at the same time submit evidence for my IH by the August 17, 2024 deadline.

13. I finally found attorneys from The Legal Aid Society a few months later. With their help, I won my immigration case in February 2025. The judge granted me withholding of removal from El Salvador, and the government did not

appeal. Because there was no appeal by ICE, I thought that meant I might get out of detention quickly. Instead, I stayed detained waiting. I learned that after 90 days in detention, I would have a custody review where ICE would decide whether to release me.

14. Then in April 2025, I was transferred from the Moshannon Valley Processing Center to the Buffalo Federal Detention Center where, in many ways, the conditions are tougher. It was hard to get information about what might happen to me. I never met my deportation officer and have never seen them at the facility. I sent messages through the detainee tablets to the immigration officers at the facility, and I asked if they were trying to deport me to another country besides El Salvador and for any information about my case. They never gave me a clear answer about the process. It was hard to even find out if I still had a 90-day custody review and who my new deportation officer at Batavia was.

15. My attorneys helped me contact my deportation officer and submit documents for my 90-day custody review. We submitted letters from my family, my friends, and my old employer and documents to show how much I have changed since my old arrests—like letters from the rehab, my social worker, and certificates from all the courses I have taken. Despite all this, I received a notice saying ICE would not release me and I would have to wait another 90 days to have my custody reviewed again. That would be a total of 180 days. My

attorneys tried to submit an appeals request, but we never heard back from any ICE officer.

16. I won't have that 180-day custody review because my immigration court case has been reopened since ICE now says they intend to send me to Mexico, a country I have no connection to and where I am afraid to go because cartels and gangs prey on outsiders like me. I'm still not even sure if Mexico will accept me and some officers at Batavia has said that Mexico isn't even accepting deportees right now. I've heard that even if Mexico accepts migrants, I might end up in detention, forced to live in horrible conditions without any way to get out. The uncertainty has been really hard on me.

### Conditions and Impacts of ICE Detention

17. I have been in ICE detention for 22 months. This time has been so difficult. I have tried hard to persevere for my family, but detention has really taken a toll on my mental and physical health. It has also taken a toll on my mother, brother, and family.

### a. Conditions at Moshannon Valley Processing Center

18. As soon as I arrived at Moshannon, the atmosphere immediately impacted me. It was different from the jail where I had finished my criminal sentence. At Moshannon, there were no religious services or learning center programs. I had access to a law library, but only once a week on Fridays.

19. Because of the incorrect gang label on my file, ICE classified me as a "high" security level, and I was subject to extra restrictions. Although I had previously

worked in the kitchen when I was in Nassau County Jail, I was unable to do so at Moshannon because of my classification. I tried to appeal my classification and explain it was wrong, but the case managers said any appeal would be denied and I should not bother. I also asked the ICE officers, but they said could not change my label, and I would have to submit a request through ICE's Washington, D.C. headquarters. I sent requests through the detainee tablets asking to contact the Washington headquarters, but I never got any answer back.

20. Conditions also got worse the longer I was there. Detainees used to get 10 free phone calls every week, before having to use commissary to pay for calls. It was how a lot of people stayed in contact with their families. Around March 2024, they stopped the free legal calls and there was a riot at Moshannon. The riot was in the Alpha building and I didn't see it because I was in the Bravo building, but the guards started treating those detained in Bravo a lot harsher after that.

21. Once the free phone call policy changed, I had to depend on my family, which was already struggling without me, to send commissary money to pay for our calls. There was supposed to be a list for indigent people, but it took months to get on the list and I never got a call through that system.

22. I also never felt safe at Moshannon. There were detainees who made weapons to use on each other, like shanks, and there were also assaults on staff. There

was even one incident in the Bravo unit recreation yard, where detainees were stabbed and officers were hurt. Thank god I hadn't gone outside that day.

### b. *Conditions at Buffalo Federal Detention Facility*

23. When I was transferred to Batavia though, conditions were even worse. In Moshannon, detainees had some ability to walk around. Here, you are treated worse than county jail inmates and kept locked in your room 18 hours each day.

24. For those 18 hours, the only company you have is your bunkmate. There is no privacy from your bunkmate, so you have to use the bathroom and get dressed and do everything in front of them. The room lights are bright and stay on all night. If you put a sheet up to try and get some privacy or block the light to sleep, you get punished and written up for 24 or 48 hours of isolation in your cell. If you get three tickets like this, you get sent to the Segregated Housing Unit (SHU) where detainees can get up to 30 or 60 days.

25. Batavia is very crowded. There are no beds in processing, the Segregated Housing Unit (SHU) or even some cells. Since July 2025, people have been sleeping on the floors because there isn't enough room for everyone.

26. The toilets in each cell only flush four times each hour so, if you and your bunkmate need more than that, you may have to wait smelling feces and urine until the toilet works again.

27. Supplies keep running out because it is so overcrowded here. It is especially hard to get soap or sanitary items, unless you can afford to buy them at

commissary. Even in commissary, they keep running out. They have also raised the prices on all commissary items across the board (e.g., bag of coffee went from $5.75 to $6). The free soap in the showers is supposed to be refilled once every week but, with the high number of people detained, it runs out within a few hours and does not get refilled until the next day at the earliest. There have been times where I've gone two days without any soap, even after I repeatedly ask officers for some. Then, the only way to get soap is to buy your own at commissary. It is clear the facility is over capacity.

28. There also isn't enough clean clothing. Now, new people don't even get uniforms when they arrive and have to wear their civilian clothes a few days. To request new clothes, you need to fill out form, listing a reason you need new clothing (like damage) and get it signed by both an officer and a lieutenant. It is really hard to get the signatures—one officer just signed "NO" on the signature line when I asked. I had to wait 1.5 months for clothes recently because the facility was at capacity and out of clothes. I had to wear a dirty yellowed shirt and shorts that were too small, and there are few clothes available to buy in commissary–there are no shirts or shorts or socks, only boxers and thermals. I asked about writing a grievance for it, but the prison officers told me it was pointless and would only make things worse for me. When I finally got clothes, they were soiled and didn't fit.

29. We only get about 2-3 hours of recreation time each day. The rec yard is a small sliver, shaped like a pizza slice and there is not much you can do there. It's smaller than half a basketball court.

30. The food portions here are small and leave me hungry. It's not possible to get any extra food, even if you work a job that takes a lot of energy. Detainees who work also get paid less here - $1 per day at Batavia, when Moshannon paid $2 or more.

31. We have also been losing privileges at Batavia recently, which makes it harder to work on your case or talk to an attorney. Earlier this month, detainees were suspended from sending faxes, even to their attorneys, because the officers said people were "abusing it" by sending more than 20 pages. Now I can't send documents to my attorney from the law library. Batavia also suspended their book program this month, so detainees cannot receive outside books at all now, even if they are to help your legal case or your health.

32. I also had a lot of trouble with legal video calls. When Immigration Judge Bailey reopened my immigration court case to hear why I am afraid to go to Mexico, Batavia didn't set up the video call for my hearing. I told the officers many times that I had a court date. I also called my attorneys, who also contacted the officers, but I missed my first hearing because Batavia never set up the video call. My attorneys also weren't able to set up legal calls with me for weeks because Batavia changed their video call system. There was some glitch with my account and it took weeks for Batavia to fix it.

33. These poor conditions put everyone on edge. I have seen multiple incidents where detainees have acted violently, attacking each other, and even pouring boiling water on each other. I have seen detainees with serious burns and peeling skin and it scares me. Just this month, I saw one detainee stab another with a razorblade over an argument about a tablet.

### c. Medical Health Issues

34. Around October or November 2024, I injured my left ankle during recreation time at Moshannon. My ankle swelled to the size of a baseball and I was in constant pain. I was referred to get an MRI but it took months before Moshannon staff took me to get one. The doctor said that I had interior and exterior ligament damage and a partial tendon tear. The doctor said it would take six months to a year to heal and that a broken bone would have healed faster.

35. It took a couple of months for ICE to approve me for the physical therapy that the doctor prescribed. I went to physical therapy maybe three times at Moshannon before I was transferred to Batavia.

36. Shortly before I was transferred, I also hurt my right ankle. In March 2025, I was doing some light exercise like the doctor told me to and I heard a crack. My ankle swelled up and I was scheduled to see an orthopedist. But I was transferred to Batavia before I ever saw them.

37. It took about a month before Batavia took me off-site to see an orthopedist. The doctor gave me a cast for my left ankle and told me to wear it for a month.

When I got back to the facility though, they gave me just a too-small plastic bag to cover the cast when I showered. I asked for something better, but I never got anything. During my second shower, the cast broke. I asked to go back to the orthopedist, but the facility staff said I couldn't because it wasn't an emergency. They said I would go back in 1.5 months as scheduled. I went to the medical unit and asked if they could at least fix the broken cast's sharp edges because the fiberglass was cutting into my foot. They told me that only the orthopedist could take it off and they just put some tape on it. Eventually, I had to take the cast off myself because it hurt so much.

38. Around June 2025, I went back to the orthopedist for the appointment where he was supposed to take my cast off. The doctor referred me for physical therapy for both my ankles and said I might need another MRI. It has been over three months now and I still have not had physical therapy or the MRI. The nurses kept telling me the request was still pending. Then on August 19, I finally met with a doctor at the detention center who told me the request for physical therapy had been cancelled. When I asked who had cancelled it or why, she would not tell me. I asked if the doctor could send a request again because the orthopedist had recommended this, but she said it would take 1-2 months for a new request to get approved. Earlier this month, I received notice that my physical therapy request was finally approved. I was scheduled for an appointment on September 19. But then, they cancelled my appointment because of overcrowding at the facility and having too many detainees in

processing. Now, I need to restart the process of getting a referral, getting it approved, and actually going to an appointment. My ankle still hurts often, and it is frustrating to keep going back to square one.

39. I used to have a special restriction on my housing because of my ankle. I had to be placed on a low tier floor, with a low bunk because of my injury. However, the special restriction was removed and now I am placed on a higher tier where I have to take stairs to get to my cell. Without the designation, they could put me on a higher bunk too, despite my injury.

40. I asked the nurses at Batavia if I could get some medication for the ankle pain in June 2025 because I had been getting medication for the pain at Moshannon called Meloxicam. They told me they couldn't prescribe any and that I would have to wait until an appointment on August 1, 2025. When August 1st came though, they told me the appointment was cancelled and none of the medical staff will tell me when it will be rescheduled. It took until only recently for me to get the Meloxicam again.

*d. Mental Health Issues*

41. I was and am still processing the traumas my family and I have experienced, but I cannot get mental health treatment in detention, even though I keep asking for help. When I was in the county jail, I was prescribed medication to help with anxiety, depression and trouble sleeping. I asked many times about getting my medication in ICE custody but detention staff say it is not possible unless I am having a mental health emergency.

42. At Moshannon, I was able to speak to a social worker once a week. That helped a little but, at Batavia, there is no access to mental health treatment. I request sick calls all the time, but I can only get an appointment maybe once a month, if that. I finally got to see a psychiatrist in July 2025, but they said I could not get the same prescriptions I had in the county jail, which were for Seroquel and Trazodone. The Seroquel and Trazodone had really worked for me and I was on it for a year before. Instead, the psychiatrist gave me just Trazodone which did not help.

43. I was finally able to get a job at Batavia, cleaning and painting the facility at night, but I get my Trazodone at 8:30 PM and it makes me tired, so I asked if I could take it at a different time. The officer I spoke to said he put in a request, but I never heard back..

44. The bad conditions and the uncertainty of this situation really mess with my mind. It feels different than when I served my county jail sentence, and I knew how much time was left. Here, I can't just do my time because the time keeps changing. First, it was until I won my immigration case. Then it was 90 days, then it was 180 days, and now I have no idea when I might be released.

45. I have done a lot to rehabilitate and use my time as best as I can. But the resources here are so limited. I have taken all the courses that I could on the tablets, and I try to help detainees who don't have attorneys with their cases and Spanish translations. But it felt like at my 90-day custody review ICE didn't even consider all the work I have done. I am not the person I was before.

My criminal history is not who I am, and I have done so much to change myself. But I've now spent far more time in ICE custody than I ever did for my criminal sentences.

46. The situation makes me feel hopeless and I have had some hard days. More and more, I feel exhausted and not interested in doing the few things I used to enjoy. It is hard for me to sleep. I also don't feel safe at the facility because of the fights, weapons, and people getting hurt.

### e. *Impacts of Detention on Family Members*

47. I try to be a strong person, but my detention is really affecting my family. When I was in county jail on Long Island, my family used to visit me often and I sent them letters, poems, and drawings. In ICE custody, none of that is possible. I have been detained far away from them, first in Phillipsburg, PA and now in Batavia, NY. My mother, stepfather, and brother haven't seen me in person in almost two years now. I also can't send them any mail from ICE custody.

48. The only way we can stay in touch is through phone calls. Since the free calls stopped over a year ago, we have had to pay for every call. Video calls are too expensive, and it takes several days to get them approved, if you can afford it. So, my family and I talk maybe three times a week on the phone.

49. My mother, Karla, has tried her best to be supportive and hopeful for me, but I know that my detention has been detrimental for her, too. My mother keeps motivating me and encouraging me to keep working on myself, despite the

circumstances. She told me that soon we will be together. I am still holding onto her words that soon we will be reunited.

50. My mother took up an extra job to support herself recently. She leaves home at 8:30AM every day to work in a warehouse and then as an office cleaner. She is on her feet all day long and doesn't get home until 10PM. I feel so helpless and it breaks me that I can't send her money or do anything to help. Her physical health is deteriorating, and she has constant back pain. I know she struggles mentally too, with her own past and with my years of detention.

51. My mother and I used to be like a team, taking care of my younger brother Emilio. Since I have been detained, I have noticed him retreating from the world more. He seems lonely and depressed. I used to be the person he could talk to and now he is much more alone.

52. After I won withholding of removal, my family thought I would be coming home soon. It causes them pain, every time they ask me how my case is going and if I will see them soon, and I don't have an answer for them.

### *Conclusion*

53. Every day of my 22 months in detention has been hard. I try not to lose hope that I'm going to hug and kiss my mom again and be reunited with my family. I thought my case and my troubles were almost over when the Immigration Judge ruled that I could not be removed to El Salvador in February 2025. Yet I am still fighting to stay in the United States and with my family.

54. Please give me the opportunity to keep fighting my case outside of immigration detention, where I can take care of my family, my physical health, and my mental health.

WHEREFORE, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*J. D. A.*

Signed, J.D.D.A.

9/23/2025

## CERTIFICATE OF CONFIRMATION OF DECLARATION

On September 23, 2025, I, Shayna Scott, Esq. read aloud the foregoing declaration over Microsoft Teams to J.D.D.A., who is detained at the Buffalo Federal Detention Facility. J.D.D.A., who is fluent in English, confirmed the contents thereof.

Date: September 23, 2025


/s/ Shayna Scott
Shayna Scott
Immigration Law Unit
The Legal Aid Society

# EXHIBIT B

**DECLARATION OF KARLA**
**IN SUPPORT OF J.D.D.A.'S WRIT OF HABEAS CORPUS**

I, Karla, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true to the best of my knowledge and belief:

1. My name is Karla. I was born in 1981 in El Salvador and currently reside in Suffolk County, New York. I am a United States citizen. I submit this declaration in support of my son, J.D.D.A.

2. J.D.D.A. is a very caring son and a respectful person above all. He is a hard worker and curious about the world around him – he likes to learn different skills and has applied himself to learning about construction. He has a strong work ethic and is kind to others.

3. J.D.D.A. is also a person who is very reserved with his emotions. He likes listening to others, but it takes a lot for him to open up when something affects him. He has gone through a lot, which has caused him to put his guard up easily.

4. I became pregnant with J.D.D.A. after I was sexually assaulted when I was about 13 years old in El Salvador. I raised him as a single mother, and we were never apart until I left for the U.S. He was about nine or ten, and we were separated for a few years. Not having his mother with him affected him significantly.

5. Over time, J.D.D.A. learned how he was conceived. I had always protected him from that information, since I thought it was important to conserve his mental health. Knowing that is not good for a child. When J.D.D.A. came to the U.S.

he asked me a lot of questions related to this. I was very hesitant to share many details, and told him when he was older we would talk more about it. Still, people had already told him he was conceived through rape and he was very confused. He carried a lot of stress and hurt that he did not have an outlet for.

6. In 2019, a death in the family also caused J.D.D.A. great sadness. My grandmother, the woman who had raised me, died in El Salvador. Though she was J.D.D.A.'s great-grandmother, she was more like a grandmother to him. She was very present in our lives.

7. I noticed a radical change in J.D.D.A. around this time. He was stuck in a depressive cycle, and he had bad friendships. These friends pushed him toward drugs.

8. In 2021 J.D.D.A. sought help with addiction and agreed to be treated at a rehabilitation center. He made attempts at other rehabilitations programs and successfully completed several programs during his time in detention in Nassau County, New York.

9. I have had many conversations with J.D.D.A. where he has apologized for his past actions. He has told me to not blame myself for his mistakes and has expressed a lot of guilt. He has learned from his errors. Once, he told me crying that he had learned his lesson and finished paying for what he deserved. That broke me. I wasn't with him to hug him or hold him.

10. I have always told J.D.D.A. that making mistakes isn't the worst thing – the worst thing in life is not learning from one's mistakes. We all learn from

different experiences in life, and we need to learn from our mistakes to grow and move forward.

11. J.D.D.A. has told me that when he gets out of detention, he wants to write about what drugs have done to his life, in order to guide others. He has said he wants to help others learn from him.

12. I know that motherhood sometimes clouds one's judgement, but I can say impartially that J.D.D.A. is easy to love. He is a person that cares for and shares with others. I have listened to the way other people talk about J.D.D.A. – they all describe J.D.D.A. as having a good heart. My partner, J.D.D.A.'s stepfather, has confidence that J.D.D.A. has changed and grown too.

13. J.D.D.A. has taken responsibility for his actions and has finished learning his lesson. He cannot tolerate detention any longer. I feel as if my back is against the wall – I do not know how to tell him to hold on when the possibility of release is so uncertain. Soon he will complete two years in detention. I have told him to keep waiting a bit longer, because we will be together soon.

14. It has been very difficult for me to visit J.D.D.A. because he is so far. Still, we talk as much as we can. We make an effort to coordinate, since in the center there is not always easy access to phones. He has opened up to me a bit about the conditions at the center. He says he is tired and often scared. The conditions are not easy, and he is locked up for most of the day. He has reported being locked inside for about 18 hours a day. Looking at the same four walls has created a lot of anxiety in him.

15. J.D.D.A. has injured both of his ankles and was seeing a doctor for it. He says the pain is intense. Receiving treatment in a detention center is not the same when you are free – he cannot see a doctor when his pain is urgent. In there, it takes days or weeks to make an appointment. There is no easy medical access, and it is not a sure thing that you are even able to see a doctor.

16. J.D.D.A.'s appetite is disappearing. The food there is not good. He requires commissary to be able to eat because the food is so bad. Sometimes on our calls he will ask what I am cooking and that crushes him. He cries now, and before immigration detention, I had barely ever heard him cry. The only thing I can do is tell him to 'let it out.' I know this has not been easy for him.

17. Every time J.D.D.A. has an immigration court hearing we get a surge of hope that he may be released. My heart races, and it has been absolutely crushing to know we have to wait longer. It is not easy to have hope and have it constantly broken like this.

18. My nerves have also been very bad since he has been in detention. If he doesn't call me, I worry he has been transferred, or something else has happened to him.

19. J.D.D.A.'s detention has also affected my younger son Emilio in many ways. Emilio worries for his brother.

20. J.D.D.A. has provided an almost paternal protection for my younger son, Emilio. J.D.D.A. has always been there for him when he has needed him. Emilio asks often when J.D.D.A. will be getting out.

21. Above all it is hard not to know what date J.D.D.A. will get out. My hands feel tied, and I have no idea what to do. If there was anything I could do to support his release I would jump at it immediately. It is beyond hurtful and frustrating to not have the power to help my son.

22. I also deeply fear J.D.D.A. being deported to Mexico because. has been incorrectly marked as an active member of MS-13. When he was about 11 some of the gang members began to bother him, and actually this was part of the reason why he left El Salvador. J.D.D.A. was never involved in any gangs in the United States. J.D.D.A. will be targeted and killed by Mexican authorities, cartels, or gangs. We have no family in Mexico and do not know anyone there. I don't know how I would even get in contact with him if he were sent there. If J.D.D.A. were sent to Mexico, I am terrified that he'll just disappear completely.

23. Family is so important, and being separated from my son has not been easy. I beg you to consider his release. I haven't abandoned hope yet.


I, Karla, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Date: August 14, 2025


Signed, Karla

## CERTIFICATE OF CONFIRMATION OF DECLARATION

I, Anik Willig, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

On August 14, 2025, I, Anik Willig, interpreted into Spanish and read aloud the foregoing Declaration during a call with Karla. I am fluent in Spanish and competent to interpret the document from Spanish into English and the interpretation is true and accurate to the best of my abilities. Karla confirmed the contents thereof.

I declare under penalty of perjury that the foregoing is true and correct.

Date: August 14, 2025

_____

Anik Willig

Paralegal Casehandler

The Legal Aid Society

49 Thomas St., 5th Floor

New York, NY 10013

332-215-6693

AWillig@legal-aid.org

# EXHIBIT  C

EXHIBIT  C

## DECLARATION OF EMILIO
## IN SUPPORT OF J.D.D.A.'S WRIT OF HABEAS CORPUS

I, Emilio, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true to the best of my knowledge and belief:

1. My name is Emilio. I was born in 2001 in El Salvador and currently reside in Suffolk County, New York. I am a permanent resident of the U.S. I submit this declaration in support of my brother, J.D.D.A.

2. J.D.D.A. is a hardworking and kind person. He has always pushed others to do better and make the best of themselves, even in the moments he himself has made mistakes.

3. When I was younger and didn't want to go to school, he would always push me to. J.D.D.A. was able to get his GED and pushed me to also graduate. He has helped me many times with my homework and has pushed me to perform well in school when I was struggling.

4. I also joined the Marine Reserves because of J.D.D.A. He wanted to join when he was younger and, though he was ultimately unable to, he encouraged me. He has inspired me a lot.

5. For the most part J.D.D.A. and I have always had a close relationship. As an older brother he has always looked out for me. He has given me a lot of life guidance – to do what's best for myself and follow my own path.

6. J.D.D.A. has come to terms with his past and told me not to commit the same mistakes he has. He struggled with addiction which he says took over him. He

has expressed a lot of regret and has wanted to be more present for our family. I have seen the change in him.

7. J.D.D.A.'s detention has affected me and the rest of our family greatly. The same day he served out his sentence he was taken by immigration. He didn't get the freedom he deserved.

8. It took my family one or two days to figure out where J.D.D.A. was. We had called the police department and was told he was released and yet had no update from him or any idea where he could be. My mom and I thought we were going to get J.D.D.A. back that day. The feeling was beyond disappointment; it was a complete loss of hope. It was almost two years ago now that this happened, and it continues to be just as hard for us today. We just want J.D.D.A. finally back with us.

9. When I was in military boot camp, J.D.D.A. was in jail. I want to have my older brother to go back to and say that 'I did it, I did it for us.' I know it was something he wanted to do, and I'm sad that he never got to see it.

10. I get the sense that J.D.D.A. is having a really hard time in detention. He feels like he has to go through these things on his own and not worry us, but I know it has set his morale down. He has been in detention a long time now. He was supposed to be released when his case was over but wasn't, which really put him down.

11. J.D.D.A. asks for commissary money to buy better food in the center. He also injured his left ankle, and later his right ankle, though I'm not sure how much treatment he has received.

12. His detention has put me in a bad headspace, as much as I don't want it to bother me. I stayed with the military to be able to prove something to him, and I want to share my experience with him to make him proud. Coming home and not having him to talk to or share anything with has been hard. J.D.D.A. and I try to keep up communication, though coordination is hard since I work multiple jobs.

13. My mom is also very down and anxious. She doesn't like to talk about this situation very much, but I've seen her mood change. After a call with him she typically stays in her room. We are both private people and don't talk openly about this often but know it has affected us in big ways.

14. As well as emotionally, Jonathan's detention has affected us financially. When we bought our house our plan was to have the three of us and our stepfather contribute, but the burden of money has fallen now to my mother and me. I am falling behind on some payments, like my credit card and car bills. It has been a struggle. I think my mom is falling behind also, but she keeps that private. She doesn't want me to worry about her.

15. My mom and I have felt real sadness and lost hope at J.D.D.A.'s being detained so long. It seems to me like he has done everything right – he's waited month after month for all of his hearings, thinking he may have the chance to finally

go back home. His release keeps getting extended for longer. We don't know when we can expect him back.

16. I miss the days J.D.D.A. and I would play video games together, and when I could go back home and talk to him about my work. Though we always worked different schedules, we could always count on sitting and eating together, or watching a movie as a family.

17. J.D.D.A. is a peaceful person, and he's never been involved in any gang activity.

18. Once J.D.D.A. gets out of detention I have family and friends willing to take him to AA and an outpatient program. J.D.D.A. has previously said he'd like to go to a program like that.

19. Our family has a great fear of J.D.D.A.'s deportation. I was about 5 and he was about 11 when we came to the US. All of our family is here, and there is nothing for us in El Salvador.

20. J.D.D.A. has future goals when he gets out – he plans to work and be reunited with his family. I hope he can get his freedom soon.


I, Emilio, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed, Emilio

Date: August 8, 2025

# EXHIBIT  D



**THE
LEGAL AID
SOCIETY
CIVIL**

Immigration Law Unit
199 Water Street
New York, NY 10038
(212) 577-3300
www.legal-aid.org

**Direct Dial: (212) 298-3244**
**Fax: (646) 616-4708**
**Email: magustinmendez@legal-aid.org**

Alan Levine
*President*

Twyla Carter
*Attorney-in-Chief*
*Chief Executive Officer*

Adriene L. Holder
*Chief Attorney*
Civil Practice

Deborah Lee
*Attorney-in-Charge*
Immigration Law Unit

September 18, 2025

Dear Honorable Judge:

This letter is respectfully submitted on behalf of J.D.D.A. and his petition for a writ of habeas corpus. I am a Licensed Master Social Worker (LMSW) and have been serving as a Forensic Social Worker at the Legal Aid Society (LAS) for over five (5) years. In this role, I have conducted a psychosocial assessment of J.D.D.A. to better understand his current functioning and to provide informed recommendations that may best address his identified needs.

The contents of this letter are based on psychosocial interviews conducted with J.D.D.A. via remote communication at the Buffalo (Batavia) Service Processing Center (BSPC). J.D.D.A. reported fluency in both English and Spanish; however, all interviews have been conducted in English at his request. Additionally, relevant supplemental health records were reviewed and integrated into the assessment to support the findings and recommendations presented in this report.

J.D.D.A. has been very attentive, respectful, and cooperative throughout the psychosocial interview sessions. He has demonstrated a willingness to engage meaningfully in the assessment process, showing insight and openness in discussing significant life challenges and barriers that have prevented him from reaching his fullest potential. It is important to note that initial findings from the psychosocial assessment have revealed that J.D.D.A.'s past is inundated with significant adversity and complex trauma, which have had a profound impact on his overall psychological functioning.

J.D.D.A.'s past history of trauma makes him a psychologically vulnerable person. Therefore, in this interviewer's professional opinion, continued detention poses a heightened risk for J.D.D.A. to experience further psychological decompensation. In light of these findings, I am respectfully requesting for this court to allow my client, J.D.D.A., to be released from immigration detention in order to access trauma-informed services and appropriate mental health treatment within the community. A community-based setting would not only support his stabilization and recovery but also enhance his ability to comply with ongoing legal obligations in a more sustainable and therapeutically appropriate environment.

**Justice in Every Borough.**

**Known History of Trauma and Life Circumstances**

As previously mentioned, the findings from the psychosocial assessment indicate that J.D.D.A. has a significant history of trauma beginning in early childhood. His formative years were marked by multiple adverse childhood experiences (ACE's)[1], including abrupt separation from his mother, exposure to punitive and atypical disciplinary practices by his grandmother, persistent feelings of abandonment, and growing up in an environment inundated by gang violence and instability. J.D.D.A. eventually left his home country of El Salvador to seek refuge in the U.S. and finally be reunited with his mother.

Upon his arrival to the U.S., J.D.D.A. made efforts to overcome the challenges of his past. He enrolled in school and expressed a sense of hopefulness, particularly due to his long-awaited reunification with his mother—a relationship he deeply yearned for and viewed as a source of emotional security. Nevertheless, J.D.D.A. continued to struggle with unresolved mental health issues rooted in his early trauma history. Moreover, this interviewer notes that J.D.D.A. has ongoing psychological distress related to the circumstances of his conception, which occurred as a result of the sexual assault of his mother by a gang member. J.D.D.A. continues to experience unresolved feelings of self-blame and guilt related to this event—despite the fact that he bears no responsibility for the trauma his mother endured. These internalized emotions have contributed to long-standing emotional pain and impaired coping, which remain unprocessed and continue to impact his mental health and self-concept.

J.D.D.A. also indicated that he did not have a father figure or a trusted adult with whom he could confide in or seek guidance from. This absence of a supportive, prosocial figure contributed to continued emotional isolation and limited his ability to develop adaptive coping skills during a critical period of his life. Unfortunately, this led J.D.D.A. to make many regrettable decisions in his life that caused him and his family much turmoil and pain. J.D.D.A. was very transparent and also shared that he developed an unhealthy relationship with substances during his young teenage years. J.D.D.A. does not take lightly the fact that he has a criminal history, and he has expressed a desire to make amends for his past and to be a positive force for himself and his family. Additionally, J.D.D.A. reported that he attended substance use treatment and participated in an in-patient program at the Corona Self-Help Center. J.D.D.A. also informed this interviewer that he has faced moments of relapse in his journey toward sobriety—a very common occurrence in the world of addiction and recovery. Nevertheless, he reports maintaining sobriety since October 2022.

**Incarceration and Psychological Decompensation**

In October 2022, J.D.D.A. was sentenced to serve time in county jail due to his criminal history.  He reported that he was scheduled for early release based on good behavior and expressed a sense of hope

---

[1] The ACE study measures traumatic events in childhood, like abuse, neglect and family dysfunction, that present a risk for future problems. *SEE* Webster E. M. (2022). The Impact of Adverse Childhood Experiences on Health and Development in Young Children. Global pediatric health, 9, 2333794X221078708. https://doi.org/10.1177/2333794X221078708

**Justice in Every Borough.**

for a better outcome. However, instead of being released, J.D.D.A. was transferred into the custody of Immigration and Customs Enforcement (ICE), an outcome that he did not anticipate and found emotionally distressing.

This interviewer notes that J.D.D.A. reported first being prescribed Seroquel and Trazodone while in criminal county jail in October 2022. Seroquel is commonly used to treat a range of mental health conditions, including Major Depressive Disorder. Trazodone also has several clinical applications and is often prescribed both as an antidepressant and to assist with sleep disturbances[2]—both of which J.D.D.A. has historically struggled with. Furthermore, J.D.D.A. experienced rapid deterioration in his mental health following his transfer to ICE custody at Moshannon Valley Processing Center (MVPC). While in ICE custody, J.D.D.A. was prescribed Buspirone and Hydroxyzine. In fact, according to medical records obtained from MVPC, his provider, Dr. Price, prescribed Buspirone due to its demonstrated effectiveness in managing anxiety disorders and their associated symptoms. Hydroxyzine was similarly prescribed to aid in the "management of anxiety disorders" and it was noted that J.D.D.A.'s treatment may require further assistance of a psychologist or medical professional.[3] J.D.D.A. reported receiving short-term clinical support from a social worker at MVPC and attended weekly sessions. According to medical records, the medical staff stopped administering these medications to J.D.D.A. after a few months.

J.D.D.A. informed this interviewer that he found some semblance of stability in his mental health with medication and supportive counseling while at MVPC. Nevertheless, in April 2025, J.D.D.A. was transferred to the Buffalo (Batavia) Service Processing Center (BSPC), which constituted a significant environmental change and resulted in notable psychological destabilization. J.D.D.A. also reports that BSPC is a much more confined environment with very limited time outside of his cell. J.D.D.A. also expressed a discomfort of having to utilize the bathroom in from of another inmate since the toilet is in an open space with no privacy.

Furthermore, J.D.D.A. stated that he was not given his medications in a timely manner, and he no longer has access to weekly sessions with a mental health provider to manage his ongoing symptoms. Additionally, this interviewer learned that J.D.D.A. no longer has access to Seroquel, and he reports that the current medication he is being offered does not properly address his symptoms. This interviewer contends that J.D.D.A. can greatly benefit form medication management from providers in a community-based setting as patients can have greater access to medical professionals, therapeutic resources, and support systems that are often lacking in detained settings. The lack of professional supports, proper medication options, and change in environment are disruptions that have contributed to a reported decline in J.D.D.A.'s mental health functioning. Furthermore, as part of this assessment,

---

[2] While trazodone is approved for the treatment of depression, the off-label use of this medication for insomnia has surpassed its usage as an antidepressant. *SEE* Jaffer, K. Y., Chang, T., Vanle, B., Dang, J., Steiner, A. J., Loera, N., Abdelmesseh, M., Danovitch, I., & Ishak, W. W. (2017). Trazodone for Insomnia: A Systematic Review. Innovations in clinical neuroscience, 14(7-8), 24–34.

[3] Medical Records obtained from MVPC, dated 01/03/2024, 01/09/2024, 02/20/24, and 03/05/2024.

this interviewer utilized the Beck Depression Inventory (BDI)[4], an evidence-based and widely accepted screening instrument to identify symptoms related to depression and to give a better understanding of the current symptoms that a person is experiencing. This interviewer notes that J.D.D.A.'s BDI scores are very concerning and indicate significant levels of depression. Based on the findings and the presenting symptoms, it is this clinician's professional opinion that J.D.D.A. is experiencing a level of psychological distress that warrants immediate structured therapeutic intervention, continued clinical monitoring, and further psychological evaluation.

**Formulation and Recommendations**

The initial findings of the psychosocial assessment conclude that J.D.D.A. is a vulnerable person due to his history of trauma and his current mental health concerns. Moreover, there is documented evidence that J.D.D.A. has historically suffered from anxiety and depression. This interviewer also contends that J.D.D.A. is likely to meet the diagnostic criteria for post-traumatic stress disorder (PTSD). Additionally, this interviewer notes that J.D.D.A. has presented as very distressed as he recounted difficult hardships throughout his life. As a practicing social worker, I am very concerned for my client, J.D.D.A., because there is a high likelihood that he can experience further psychological decompensation, based on his history of mental health concerns, if he remains in a detained setting and without the necessary structured therapeutic supports.

In addition to the mental health concerns previously outlined, a critical contributing factor to J.D.D.A.'s current psychological condition is the fact that he has been held in detention for around three (3) years. This interviewer contends that prolonged detention—particularly in the context of preexisting mental health vulnerabilities such as a history of depression and anxiety—can have profound and enduring psychological consequences. The cumulative stressors associated with long-term confinement, including social isolation, uncertainty about the future, lack of autonomy, and limited access to consistent mental health care, can exacerbate existing psychological symptoms and may contribute to the development of new psychological disorders. The available research on this topic suggests that, "…detention lasting 6 months or longer was associated with even higher rates of poor self-rated health, mental illness, and PTSD following release."[5]These findings align with a growing body of evidence suggesting that prolonged detention signif0icantly increases the risk of psychological distress and long-term psychiatric morbidity. Given the duration of J.D.D.A.'s detention and his history of mental health challenges, it is clinically significant to consider his current symptoms within the broader context of detention-related trauma. His presentation is consistent with an individual at high risk for complex psychological distress, and these concerns should be addressed

---

[4] The Beck depression inventory (BDI) is among the most used self-rating scales for measuring depression worldwide. *SEE* Yuan-Pang Wang, Clarice Gorenstein (2021), The Beck depression inventory: Uses and applications. *The Neuroscience of Depression*, Pages 165-174, ISBN 9780128179338, https://doi.org/10.1016/B978-0-12-817933-8.00020-7.

[5] Saadi A, Patler C, Langer P. Duration in Immigration Detention and Health Harms. JAMA Netw Open. 2025;8(1):e2456164. doi:10.1001/jamanetworkopen.2024.56164

**Justice in Every Borough.**

with urgency through trauma-informed, comprehensive mental health care in a community-based setting.

Moreover, in my professional opinion, J.D.D.A. will be much better equipped to manage his mental health concerns in a community-based setting. J.D.D.A. has proven to attend treatment opportunities that have been offered to him in the past, such as the reported three (3) month in-patient treatment program he attended at the Corona Self-Help Center in July 2022. Additionally, J.D.D.A. has responded well to the short-term clinical support that has been offered by our social work department at LAS. J.D.D.A. has also voiced a desire to continue caring for his mental health and accepts this interviewer's recommendations. This interviewer contends that J.D.D.A. can have much better success in different aspects of his life if he addresses his mental health concerns while he meets his legal, personal, and other pertinent responsibilities.

Furthermore, it is important to consider J.D.D.A.'s treatment history and the successes he has garnered along his continued path toward sobriety. This interviewer notes that J.D.D.A. consistently talks about prosocial goals and aspirations in life. J.D.D.A. has consistently expressed a strong interest in attending trade school or other educational opportunities as a means to achieve stable, gainful employment. In multiple sessions, he has demonstrated motivation to become financially independent and to contribute meaningfully to his household, particularly in supporting his mother, whom he identifies as a primary source of emotional and social support. Moreover, this interviewer notes that, in the clinical realm of the social work profession, this type of reflective self-awareness and self-determined hope are elements of "change talk." J.D.D.A. has voiced expressions of change talk; a strong commitment that he is focused on living a productive and civilly responsible life. His expressed goals reflect a developing sense of responsibility and future orientation, both of which are protective factors that support rehabilitation and pro-social decision-making. Furthermore, studies have shown that it is very important to continually elicit and provide a supportive environment to help people continue developing this mindset in order bring about a long-term and sustainable positive outcome.[6] This interviewer contends that J.D.D.A.'s mother is an essential and very supportive figure in his life that can continue to influence him in prosocial ways.

Additionally, this interviewer has observed firsthand and commends J.D.D.A.'s ability to respond well to short-term psychotherapeutic support that has been offered to him by the LAS social work department. This is yet another protective factor that can help J.D.D.A. transitions successfully into the community. This interviewer contends that J.D.D.A. is ready and able to successfully engage with long-term and more structured therapeutic interventions that will address deeper rooted life issues that he is beginning to heal from. This interviewer has worked with J.D.D.A. to identify a community-based therapist that will continue to support his sobriety and other mental health concerns. This referral will also serve as a significant protective factor since J.D.D.A. will expand his social support network

---

[6] Resnicow, K., & McMaster, F. (2012). Motivational Interviewing: moving from why to how with autonomy support. The international journal of behavioral nutrition and physical activity, 9, 19. https://doi.org/10.1186/1479-5868-9-19

**Justice in Every Borough.**

to also include a professional mental health specialist that can help him address multiple life concerns, leading to more opportunities for his long-term success.

In light of this information, I am respectfully requesting for this Court to allow J.D.D.A. to be released from immigration detention so that he can be connected to the psychological services he needs. Furthermore, I have identified the following as a viable option for J.D.D.A.:

1. **Hispanic Counseling Center (HCC):** HCC offers a variety of services that can help Mr. Diaz Alfaro address his mental health concerns. The services that he can benefit from are behavioral management, individual and/or group counseling sessions, case management services, and further psychological evaluations. Additionally, HCC offers services throughout Long Island, and they can provide referrals for other needed services that meets J.D.D.A.'s needs.

As J.D.D.A.'s social worker, I am committed in helping him navigate the referral and intake process for the aforementioned recommendation, or similar treatments sites, as soon as feasibly possible. Furthermore, I can continue to provide assessments to identify any additional resource or service that he may need.

The Social Work Department thanks the Court for their consideration of the contents of this letter.

Respectfully submitted,

_____
Marlon Agustin-Mendez, LMSW
Forensic Social Worker
Immigration Law Unit

**Justice in Every Borough.**

# EXHIBIT E



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ELIZABETH IMMIGRATION COURT**

Respondent Name:

D███ A███████, J███████ D████

To:

Scott, Shayna
49 Thomas Street
5th Floor
New York, NY 10013

A-Number:

████████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
02/21/2025

## ORDER OF THE IMMIGRATION JUDGE

☐ This is a summary of the oral decision entered on _____ . The oral decision in this case is the official opinion, and the immigration court issued this summary for the convenience of the parties.

☑ Both parties waived the issuance of a formal oral decision in this proceeding.

### I.  Removability

The immigration court found Respondent ☐ removable ☑ inadmissible under the following Section(s) of the Immigration and Nationality Act (INA or Act): 212(a)(6)(A)(i)

The immigration court found Respondent ☐ not removable ☐ not inadmissible under the following Section(s) of the Act:

### II.  Applications for Relief

Respondent's application for:

A.  Asylum/Withholding/Convention Against Torture

☑ Asylum was ☐ granted ☑ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☑ Withholding of Removal under INA § 241(b)(3) was ☑ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Withholding of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Deferral of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Respondent knowingly filed a frivolous application for asylum after notice of the consequences. *See* INA § 208(d)(6); 8 C.F.R. §1208.20

B. Cancellation of Removal

☐ Cancellation of Removal for Lawful Permanent Residents under <u>INA § 240A(a)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Cancellation of Removal for Nonpermanent Residents under <u>INA § 240A(b)(1)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Special Rule Cancellation of Removal under <u>INA § 240A(b)(2)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

C. Waiver

☐ A waiver under INA § was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

D. Adjustment of Status

☐ Adjustment of Status under INA § was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

E. Other

**III.    Voluntary Departure**

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a) ☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ denied.

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a) ☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ granted, and Respondent is ordered to depart by             . The respondent must post a $ bond with DHS within five business days of this order. Failure to post the bond as required or to depart by the required date will result in an alternate order of removal to taking effect immediately.

☐ The respondent is subject to the following conditions to ensure his or her timely departure from the United States:

☐  Further information regarding voluntary departure has been added to the record.

☐ Respondent was advised of the limitation on discretionary relief, the consequences for failure to depart as ordered, the bond posting requirements, and the consequences of filing a post-order motion to reopen or reconsider:

If Respondent fails to voluntarily depart within the time specified or any extensions granted by the DHS, Respondent shall be subject to a civil monetary penalty as provided by relevant statute, regulation, and policy. *See* INA § 240B(d)(1). The immigration court has set
☐   the presumptive civil monetary penalty amount of $3,000.00 USD
☐   $ USD instead of the presumptive amount.
If Respondent fails to voluntarily depart within the time specified, the alternate order of removal shall automatically take effect, and Respondent shall be ineligible, for a period of

10 years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act, to include cancellation of removal, adjustment of status, registry, or change of nonimmigrant status. *Id.* If Respondent files a motion to reopen or reconsider prior to the expiration of the voluntary departure period set forth above, the grant of voluntary departure is automatically terminated; the period allowed for voluntary departure is not stayed, tolled, or extended. If the grant of voluntary departure is automatically terminated upon the filing of such a motion, the penalties for failure to depart under section 240B(d) of the Act shall not apply.

If Respondent appeals this decision, Respondent must provide to the Board of Immigration Appeals (Board), within 30 days of filing an appeal, sufficient proof of having posted the voluntary departure bond. The Board will not reinstate the voluntary departure period in its final order if Respondent does not submit timely proof to the Board that the voluntary departure bond has been posted.

In the case of conversion to a removal order where the alternate order of removal immediately takes effect, where Respondent willfully fails or refuses to depart from the United States pursuant to the order of removal, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

### IV. Removal

☑ Respondent was ordered removed to El Salvador

☐ In the alternative, Respondent was ordered removed to

☐ Respondent was advised of the penalties for failure to depart pursuant to the removal order:

> If Respondent is subject to a final order of removal and willfully fails or refuses to depart from the United States pursuant to the order, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

### V. Other

☐ Proceedings were ☐ dismissed ☐ terminated with prejudice
   ☐ terminated without prejudice ☐ administratively closed.

☐ Respondent's status was rescinded under INA § 246.

☑ Other:

> Removal withheld under the INA.

Immigration Judge: BAILEY, RICHARD 02/21/2025

Appeal:   Department of Homeland Security: ☑ waived   ☐ reserved
          Respondent:                       ☑ waived   ☐ reserved

Appeal Due:

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable
To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS
Respondent Name : D█████ A██████, J████████ D████ | A-Number : █████████
Riders:
Date: 02/24/2025 By: RIVERA, CARMEN, Court Staff

# EXHIBIT  F



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ELIZABETH IMMIGRATION COURT**

Respondent Name:

D█ A█████, J████████ D█

To:

D█ A█████, J████████ D█
555 GEO DR
PHILIPSBURG, PA 16866

A-Number:

███████

Riders:
In Custody Redetermination Proceedings

Date:
07/17/2024

### ORDER OF THE IMMIGRATION JUDGE

The respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236. After full consideration of the evidence presented, the respondent's request for a change in custody status is hereby ordered:

☑ Denied, because
Respondent has not established to the satisfaction of the court that he is not a danger to the community.

☐ Granted. It is ordered that Respondent be:
   ☐ released from custody on his own recognizance.
   ☐ released from custody under bond of $
   ☐ other:

☐ Other:



Immigration Judge: BAILEY, RICHARD 07/17/2024

Appeal:  Department of Homeland Security: ☑ waived  ☐ reserved
         Respondent:                       ☐ waived  ☑ reserved

Appeal Due: 08/16/2024


### Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service

To: [ ] Noncitizen | [ M ] Noncitizen c/o custodial officer | [ ] Noncitizen's atty/rep. | [ M ] DHS

Respondent Name : D    A    ,    J    D    | A-Number :

Riders:

Date: 07/17/2024 By: VITALI, PATRICIA, Court Staff

# EXHIBIT  G

EXHIBIT  G

*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
250 Delaware Avenue, Floor 7
Buffalo, NY 14202



**U.S. Immigration
and Customs
Enforcement**

D███ A████, ████ D███
c/o Immigration and Customs Enforcement
Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, NY 14020

████████

## Decision to Continue Detention

This letter is to inform you that your custody status has been reviewed, and it has been determined that you will not be released from the custody of U.S. Immigration and Customs Enforcement (ICE) at this time. This decision has been made based on a review of your file and upon review of the factors for consideration set forth at 8 C.F.R. § 241.4(e), (f), and (g).

As explained below, after such review, ICE has determined to maintain your custody because:

- You have not demonstrated that, if released, you will not:

  - Pose a danger to the community, to the safety of other persons, or to property.

ICE has made such determination based upon:

You entered the United States without proper legal documents or a valid entry document. Since your illegal entry, you have been arrested multiple times, resulting in convictions of crimes of damage of property, possession of stolen property, disorderly conduct, and larceny. Also, while in county law enforcement custody, you were assaultive towards staff. Given your wanton disregard of the criminal and immigration laws of the United States, ICE believes that you pose a danger to the community should you be released.

Based on the above, you are to remain in ICE custody pending your removal from the United States as ICE is unable to conclude that the factors set forth at 8 C.F.R. § 241.4(e) have been satisfied. You are advised that you must demonstrate that you are making reasonable efforts to comply with the order of removal and that you are cooperating with ICE's efforts to remove you by taking whatever actions ICE requests to affect your removal. You are also advised that any willful failure or refusal on your part to make timely application in good faith for travel or other documents necessary for your departure, or any conspiracy or actions to prevent your removal or obstruct the issuance of a travel document, may subject you to criminal prosecution under 8 U.S.C. § 1253(a).

## Decision to Continue Detention
D█ A█, J█ D█

If you have not been released or removed from the United States at the expiration of the three-month period after this 90-day review, jurisdiction of the custody decision in your case will be transferred to the ICE Headquarters (ERO Removal Division), Potomac Center North, 500 12th Street SW, Washington, DC 20536. The ERO Removal Division will thereafter conduct a custody review and will make a determination regarding whether you will continue to be detained pending removal or may be released.

To assist in the ERO Removal Division custody review, you will be afforded a personal interview. You and your representative who has filed a Form G-28, Notice of Entry of Appearance, if any, will be notified of the date and time of the interview approximately 30 days prior to the scheduled interview date. This interview may be in person or through a video teleconference. If ERO needs to change the date of the interview, ERO will provide notice to you and your representative who has filed a Form G-28, Notice of Entry of Appearance, if any.

You may be accompanied during the interview by a person of your choice, subject to security requirements at the detention facility, as long as this person is able to attend the interview at the scheduled time.

You may submit any additional documentation in English you wish to be considered in support of your release at the time of the interview or via mail service up to five business days prior to the scheduled time of your interview to the following address:

Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, NY 14020

Such documentation should contain a cover letter indicating that the material is submitted in support of your Post Order Custody Review personal interview. An attorney or other person may submit materials on your behalf.

You are required to complete the below information.

**I do_____ do not_____ want a personal interview.**

**If you do want an interview, please check the appropriate box(es) below:**

☐      Check this box if you need an interpreter for your interview.
Language/Dialect: _____

☐      I will be assisted at this interview by a representative of my own choosing.

Name:_____

## Decision to Continue Detention
D█ A█ █, J█ D█ █

If your representative has not filed a G-28, Notice of Entry of Appearance, on your behalf, you are responsible for notifying any other person you have selected to assist you of the date, time, and location of the interview. The representative must be at least 18 years of age.

You will be sent a separate Notice to Alien of Interview for Review of Custody Status approximately 30 days before the interview is scheduled. If you wish to request additional time to prepare for the interview, you must notify your deportation officer within five business days of receipt of the Notice of Interview. If ERO agrees to postpone the interview at your request, you will be deemed to have waived its completion prior to jurisdiction over your case transferring to the ERO Removal Division.

You will be notified of the decision in your case when the custody review has been concluded by the ERO Removal Division.

5/28/25

Signature of Field Office Director, ERO/Designated Representative          Date

# Decision to Continue Detention
D█ A█, J█ D█

---

## PROOF OF SERVICE

### (Officer to complete both (a) and (b) below.)

(a)    I _____ Smith 9677, Deportation Officer _____ ,
          Name of ICE Officer           Title

certify that I served _____ with a copy of
                 Name of detainee

this document at _____ Buffalo Federal Detention Facility on _5/29/25_ , at _0800_

           Institution           Date           Time

(b)    I certify that I served the custodian _____ ,
                                     Name of Official

_____, at _____, on
    Title                   Institution
_____ with a copy of this document.
   Date

Detainee Signature:_____     Date: _____

( ) cc: Attorney of Record or Designated Representative
( ) cc: A-File

# EXHIBIT  H

D█████-A█████████, J████████       **Location:** ICE - ████████████     **DOB:** ████████

| | | | | |
|---|---|---|---|---|
| **Male** | | | | |
| Anniversary Date: | **11/16/2023** | | TB Date & Result: | |
| Race | **U** | | Language | **English** |
| Lactation Flag | **False** | | Alt Num | ████████████████ |
| Smoking Status | | | Suicide Status | **N/A** |
| Height/Wt | **5'9"  185 lbs** | | Pregnancy | **No** |

## Allergies

| Allergy | Onset Date | Severity | Onset Type |
|---|---|---|---|
| NO KNOWN DRUG ALLERGY | | N/A | N/A |
| ONIONS | | MILD | ADULT |

## Immunizations

### Immunizations

| VACCINE | DATE GIVEN | LOT # | MANUFACTURER | VACCINATOR | ADMIN SITE | TEMP | NOTES |
|---|---|---|---|---|---|---|---|

### Immunization Refusals/Exemptions

| VACCINE | DATE | RECORDED BY | TYPE | NOTES |
|---|---|---|---|---|
| SARS-COV-2 (COVID-19) VACCINE, MRNA, SPIKE PROTEIN, LNP, PRESERVATIVE FREE, 100 MCG/0.5ML DOSE OR 50 MCG/0.25ML DOSE (e.g., COVID-19, mRNA, LNP-S, PF, 100 mcg/0.5mL dose or 50 mcg/0.25mL dose) | 11/20/2023 | MANN, SHANIA | REF | REFUSED |
| INFLUENZA, SPLIT VIRUS, TRIVALENT, INJECTABLE, CONTAINS PRESERVATIVE (e.g., Influenza, split virus, trivalent, preservative) | 11/20/2023 | MANN, SHANIA | REF | REFUSED |

## Medications

| Medication | DC Date | Start Date | Stop Date | Last Admin |
|---|---|---|---|---|
| **Active** | | | | |
| **Benz Peroxide 10% Lotion (ACNE MEDICATION) - KOP** | | 10/22/2024 | 11/4/2024 | 10/23/2024 |
| *WESTEN, CHELSEA* | | | | |
| *APPLY LOTION TOPICALLY ONCE DAILY* | | | | |

## Problem List

| Problem Description | Start Date | Diagnosed By | Resolved By | Stop Date |
|---|---|---|---|---|
| ICD-10- (Z13.9) - (CHRONIC) - Encounter for screening, unspecified | 5/16/2024 | DOC- BROWN, CHRISTINA | | |
| ICD-10- (L70.8) - (CHRONIC) - Acne, other | 2/16/2024 | DOC- BROWN, CHRISTINA | | |

## Lab Result Summary

| **EHR Clinical Report** | **Facility:** | PAMV - MOSHANNON VALLEY CORR CENTER |
|---|---|---|
| | **Created By:** | BURNETT, ZACKARIA |
| | **Created On:** | 10/24/2024 11:52:07 AM |

D■-A■■■■■, J■■■■■                                     **Location:** ICE - ■■■■■■■■■■       **DOB:** ■■■■■■■■

| Service | Provider | Collected Date | Result Date |
|---|---|---|---|
| Vitamin D, 25-Hydroxy | GONDER, C | 09/20/2024 10:00A | 09/21/2024 9:09A |
| TSH | GONDER, C | 09/20/2024 10:00A | 09/21/2024 5:07A |
| Comp. Metabolic Panel (14) | GONDER, C | 09/20/2024 10:00A | 09/21/2024 5:07A |
| CBC With Differential/Platelet | GONDER, C | 09/20/2024 10:00A | 09/21/2024 5:07A |
| RIGHT TEMPOROMANDIBULAR JOINT UNILAT-RT | CHELSEA, WESTEN | 09/20/2024 10:45A | 09/20/2024 10:45A |
| ABBOTT ID NOW RAPID MOLECULAR TEST | BROWN, CHRISTINA | 01/08/2024 7:30A | 01/08/2024 12:44P |
| ABBOTT BINAX NOW ANTIGEN TEST | WESTEN, CHELSEA | 01/03/2024 16:30P | 01/04/2024 5:55A |
| ABBOTT BINAX NOW ANTIGEN TEST | COMPERE, WILKERSON | 01/03/2024 17:00P | 01/03/2024 18:54P |
| ABBOTT BINAX NOW ANTIGEN TEST | COMPERE, WILKERSON | 12/03/2023 9:00A | 12/03/2023 9:03A |
| ABBOTT BINAX NOW ANTIGEN TEST | WESTEN, CHELSEA | 11/18/2023 15:00P | 11/18/2023 15:54P |

## Vitals Summary

| Vitals Type Desc | Vital Information | Recorded By | Date Taken |
|---|---|---|---|
| BODY TEMPERATURE | 97.3 °F | WESTEN, CHELSEA | 10/15/2024 9:30:24 AM |
| BODY TEMPERATURE | 97.8 °F | SAYERS, THERESE | 10/9/2024 2:34:44 PM |
| BODY TEMPERATURE | 98 °F | RECORDS, CHELSEY | 9/17/2024 10:38:36 AM |
| BODY TEMPERATURE | 98.1 °F | WESTEN, CHELSEA | 9/11/2024 12:45:21 PM |
| BODY TEMPERATURE | 97.6 °F | SAYERS, THERESE | 9/7/2024 2:47:37 PM |
| BODY TEMPERATURE | 97.8 °F | MANN, SHANIA | 8/30/2024 8:21:49 AM |
| BODY TEMPERATURE | 97.6 °F | BROWN, CHRISTINA | 7/17/2024 8:10:52 AM |
| BODY TEMPERATURE | 98 °F | CURTIS, MICHELLE | 7/15/2024 11:26:38 AM |
| BODY TEMPERATURE | 97.9 °F | GONDER, CARLY | 7/10/2024 8:49:20 AM |
| BODY TEMPERATURE | 98.1 °F | RECORDS, CHELSEY | 7/3/2024 10:25:11 AM |
| BODY TEMPERATURE | 97.2 °F | WESTEN, CHELSEA | 5/28/2024 2:22:52 PM |
| BODY TEMPERATURE | 97.1 °F | LITTLE, LYNDZ | 5/22/2024 3:45:36 PM |
| BODY TEMPERATURE | 98 °F | MANN, SHANIA | 5/16/2024 10:59:26 AM |
| BODY TEMPERATURE | 98.0 °F | SHAW, BETH | 5/7/2024 6:24:05 PM |
| BODY TEMPERATURE | 98.1 °F | MANN, SHANIA | 5/6/2024 10:47:18 AM |
| BODY TEMPERATURE | 97.6 °F | BURGE, KATELYNN | 5/4/2024 12:19:01 PM |
| BODY TEMPERATURE | 97.6 °F | BURGE, KATELYNN | 5/4/2024 12:15:32 PM |
| BODY TEMPERATURE | 98.1 °F | WESTEN, CHELSEA | 4/24/2024 4:36:01 PM |
| BODY TEMPERATURE | 97.7 °F | GONDER, CARLY | 4/10/2024 4:25:45 PM |

**EHR Clinical Report**

| | |
|---|---|
| **Facility:** | PAMV - MOSHANNON VALLEY CORR CENTER |
| **Created By:** | BURNETT, ZACKARIA |
| **Created On:** | 10/24/2024 11:52:07 AM |

| Document Date | Document Name | Group | Category | Created By |
|---|---|---|---|---|
| 11/16/2023 11:57:22 AM | TRANSFER INTAKE DOCUMENTATION | Medical | Intake, Transfer | HAWES, AUDRA, MRC |
| 12/13/2023 7:16:04 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BROWN, MELINDA, MRC |
| 12/12/2023 11:23:21 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BROWN, MELINDA, MRC |
| 1/2/2024 12:25:07 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 1/4/2024 9:56:08 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | HAWES, AUDRA, MRC |
| 1/4/2024 11:19:34 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 1/4/2024 2:03:03 PM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | BURNETT, ZACKARIA, MRC |
| 1/16/2024 1:35:29 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 1/18/2024 6:13:00 AM | REFUSAL OF HEALTH SERVICES-MEMORANDUM | Medical | Refusal of Treatments | BROWN, MELINDA, MRC |
| 2/28/2024 1:08:26 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 2/29/2024 12:27:17 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 2/29/2024 2:33:52 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 3/11/2024 1:31:53 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | HUGHES, JENNIFER, MRC |
| 3/12/2024 12:18:29 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 3/18/2024 9:58:49 AM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | BURNETT, ZACKARIA, MRC |
| 5/7/2024 9:55:40 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 5/15/2024 12:08:02 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 5/15/2024 9:43:34 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | MAXIM, LILLIAN, CDA |
| 5/17/2024 11:05:06 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | SANKER, JONATHAN, MRC |
| 5/17/2024 11:43:01 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | MAXIM, LILLIAN, CDA |
| 5/16/2024 10:09:31 AM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | MAXIM, LILLIAN, CDA |
| 5/22/2024 9:56:49 AM | INMATE REQUEST TO STAFF | Medical | Medical | BURNETT, ZACKARIA, MRC |
| 5/23/2024 9:47:58 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 5/30/2024 11:37:12 AM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | MAXIM, LILLIAN, CDA |
| 7/5/2024 1:09:35 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 7/17/2024 1:33:34 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | SANKER, JONATHAN, MRC |
| 7/22/2024 12:25:59 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 8/15/2024 8:36:19 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 8/14/2024 9:18:36 AM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | ANNA, KAYLA, MRC |

**Patient Document Upload Summary**

**Facility:** PAMV - MOSHANNON VALLEY CORR CENTER

**Created By:** BURNETT, ZACKARIA

**Created On:** 10/24/2024 11:52:07 AM

| 9/3/2024 11:35:30 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
|---|---|---|---|---|
| 9/13/2024 10:13:53 AM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | BURNETT, ZACKARIA, MRC |
| 9/18/2024 12:42:09 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | SANKER, JONATHAN, MRC |
| 9/24/2024 8:50:30 AM | Diagnostic Notification form | Medical | Laboratory | ANNA, KAYLA, MRC |
| 9/24/2024 8:52:01 AM | Diagnostic Notification form | Medical | Laboratory | ANNA, KAYLA, MRC |
| 9/30/2024 10:57:44 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | ANNA, KAYLA, MRC |
| 10/2/2024 11:29:31 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 10/2/2024 10:17:52 AM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | BURNETT, ZACKARIA, MRC |
| 10/10/2024 10:50:22 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | ANNA, KAYLA, MRC |

**Patient Document Upload Summary**

**Facility:**       PAMV - MOSHANNON VALLEY CORR CENTER

**Created By:**   BURNETT, ZACKARIA

**Created On:**   10/24/2024 11:52:07 AM

**D...-A..., J...**      **Location: ICE -**      **DOB:**

| | **Male** | | | |
|---|---|---|---|---|
| | Anniversary Date: | **11/16/2023** | TB Date & Result: | |
| | Race | **U** | Language | **English** |
| | Lactation Flag | **False** | Alt Num | |
| | Smoking Status | | Suicide Status | **N/A** |
| | Height/Wt | **5'9"  180 lbs** | Pregnancy | **No** |

## Allergies

| Allergy | Onset Date | Severity | | Onset Type |
|---|---|---|---|---|
| NO KNOWN DRUG ALLERGY | | N/A | | N/A |
| ONIONS | | MILD | | ADULT |

## Immunizations

### Immunizations

| VACCINE | DATE GIVEN | LOT # | MANUFACTURER | VACCINATOR | ADMIN SITE | TEMP | NOTES |
|---|---|---|---|---|---|---|---|

### Immunization Refusals/Exemptions

| VACCINE | DATE | RECORDED BY | TYPE | NOTES |
|---|---|---|---|---|
| TETANUS TOXOID, REDUCED DIPHTHERIA TOXOID, AND ACELLULAR PERTUSSIS VACCINE, ADSORBED<br><br>(e.g., Tdap) | 2/28/2025 | BROWN, CHRISTINA | REF | |
| TETANUS AND DIPHTHERIA TOXOIDS, ADSORBED, PRESERVATIVE FREE, FOR ADULT USE, LF UNSPECIFIED<br><br>(e.g., Td, adsorbed, preservative free, adult use, Lf unspecified) | 12/9/2024 | CLARK, MARY | REF | REFUSED |
| INFLUENZA, SPLIT VIRUS, QUADRIVALENT, INJECTABLE, PRESERVATIVE FREE<br><br>(e.g., Influenza, split virus, quadrivalent, PF) | 11/4/2024 | REBAR, KATELYN | REF | DECLINED 2024-2025 FLU VACCINE. REFUSAL SIGNED |
| SARS-COV-2 (COVID-19) VACCINE, MRNA, SPIKE PROTEIN, LNP, PRESERVATIVE FREE, 100 MCG/0.5ML DOSE OR 50 MCG/0.25ML DOSE<br><br>(e.g., COVID-19, mRNA, LNP-S, PF, 100 mcg/0.5mL dose or 50 mcg/0.25mL dose) | 11/20/2023 | MANN, SHANIA | REF | REFUSED |
| INFLUENZA, SPLIT VIRUS, TRIVALENT, INJECTABLE, CONTAINS PRESERVATIVE<br><br>(e.g., Influenza, split virus, trivalent, preservative) | 11/20/2023 | MANN, SHANIA | REF | REFUSED |

## Medications

  No Medications indicated

## Problem List

| **EHR Clinical Report** | **Facility:** | PAMV - MOSHANNON VALLEY CORR CENTER |
|---|---|---|
| | **Created By:** | ANNA, KAYLA |
| | **Created On:** | 08/26/2025 6:55:06 AM |

D█-A█████, J████████      **Location:**      **DOB:**

| Problem Description | Start Date | Diagnosed By | Resolved By | Stop Date |
|---|---|---|---|---|
| ICD-10- (J06.9) - (ACUTE) - Acute upper respiratory infection, unspecified | 4/6/2025 | DOC- COMPERE, WILKERSON | | |
| ICD-10- (M25.471) - (ACUTE) - Effusion, right ankle | 3/18/2025 | DOC- COMPERE, WILKERSON | | |
| ICD-10- (M25.572) - (CHRONIC) - Pain in left ankle and joints of left foot | 2/28/2025 | DOC- BROWN, CHRISTINA | | |
| DSM-V- (300.02) - (CHRONIC) - Generalized anxiety disorder | 2/14/2025 | U- DORMAN, PAMELA | | |
| ICD-10- (M25.472) - (ACUTE) - Effusion, left ankle | 12/3/2024 | DOC- SHAW, BETH | | |
| ICD-10- (E78.5) - (CHRONIC) - Hyperlipidemia, unspec. | 11/6/2024 | DOC- WESTEN, CHELSEA | | |
| ICD-10- (Z13.9) - (CHRONIC) - Encounter for screening, unspecified | 5/16/2024 | DOC- BROWN, CHRISTINA | | |
| ICD-10- (L70.8) - (CHRONIC) - Acne, other | 2/16/2024 | DOC- BROWN, CHRISTINA | | |

## Lab Result Summary

| Service | Provider | Collected Date | Result Date |
|---|---|---|---|
| RIGHT ANKLE COMPLETE, MIN 3V-RT | CHELSEA, WESTEN | 03/28/2025 0:47A | 03/28/2025 0:47A |
| Urinalysis | COMPERE, WILKERSON | 03/02/2025 12:30P | 03/02/2025 12:20P |
| RPR, Rfx Qn RPR/Confirm TP | WESTEN, C | 02/05/2025 10:30A | 02/07/2025 9:08A |
| Hepatic Function Panel (7) | WESTEN, C | 02/05/2025 10:30A | 02/07/2025 9:08A |
| TSH | WESTEN, C | 02/05/2025 10:30A | 02/07/2025 6:08A |
| Lipid Panel | WESTEN, C | 02/05/2025 10:30A | 02/07/2025 6:08A |
| Comp. Metabolic Panel (14) | WESTEN, C | 02/05/2025 10:30A | 02/07/2025 6:08A |
| CBC With Differential/Platelet | WESTEN, C | 02/05/2025 10:30A | 02/07/2025 5:06A |
| Hepatic Function Panel (7) | COMPERE, W | 12/03/2024 10:30A | 12/04/2024 9:10A |
| Hemoglobin A1c | COMPERE, W | 12/03/2024 10:30A | 12/04/2024 5:07A |
| Lipid Panel | COMPERE, W | 12/03/2024 10:30A | 12/04/2024 5:07A |
| LEFT ANKLE COMPLETE, MIN 3V-LT | WILKERSON, COMPERE | 11/08/2024 8:08A | 11/08/2024 8:08A |
| XRAY CHEST SINGLE VIEW | WILKERSON, COMPERE | 11/01/2024 10:09A | 11/01/2024 10:09A |
| RPR, Rfx Qn RPR/Confirm TP | COMPERE, W | 10/28/2024 11:30A | 10/30/2024 12:09P |
| Lipid Panel | COMPERE, W | 10/28/2024 11:30A | 10/30/2024 12:09P |
| HIV Ab/p24 Ag with Reflex | COMPERE, W | 10/28/2024 11:30A | 10/30/2024 6:11A |

## Vitals Summary

| Vitals Type Desc | Vital Information | Recorded By | Date Taken |
|---|---|---|---|
| BODY TEMPERATURE | 97.8 °F | HUGAR, BRANDI | 4/6/2025 1:20:17 PM |

## EHR Clinical Report

**Facility:** PAMV - MOSHANNON VALLEY CORR CENTER

**Created By:** ANNA, KAYLA

**Created On:** 08/26/2025 6:55:06 AM

| Document Date | Document Name | Group | Category | Created By |
|---|---|---|---|---|
| 10/2/2024 11:29:31 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 10/2/2024 10:17:52 AM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | BURNETT, ZACKARIA, MRC |
| 10/10/2024 10:50:22 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | ANNA, KAYLA, MRC |
| 10/29/2024 9:36:58 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 11/13/2024 9:42:07 AM | EKG | Medical | Diagnostics | BURNETT, ZACKARIA, MRC |
| 11/22/2024 4:20:09 PM | ECG Study (Preliminary) -- 2024-11-10 | Medical | Diagnostics, ECG | INC, COMPUMED |
| 11/19/2024 9:13:29 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | ANNA, KAYLA, MRC |
| 11/18/2024 10:37:38 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 11/25/2024 9:10:57 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 12/2/2024 12:23:58 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 12/5/2024 12:02:16 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BURNETT, ZACKARIA, MRC |
| 12/6/2024 9:27:53 AM | CONSULT AUTHORIZATION | Medical | Authorization, Consultation, Pre-Consult | BROWN, MELINDA, MRC |
| 12/24/2024 8:03:51 AM | CONSULT FINAL FINDINGS DOCUMENTATION | Medical | Consult Final Findings, Consultation, Post-Consult | BROWN, MELINDA, MRC |
| 1/7/2025 1:35:47 PM | INMATE REQUEST TO STAFF | Medical | Medical | SANKER, JONATHAN, MRC |
| 1/9/2025 1:20:01 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | SANKER, JONATHAN, MRC |
| 1/14/2025 9:54:00 AM | CONSULT AUTHORIZATION | Medical | Authorization, Consultation, Pre-Consult | BROWN, MELINDA, MRC |
| 1/16/2025 12:01:57 PM | CONSULT FINAL FINDINGS DOCUMENTATION | Medical | Consult Final Findings, Consultation, Post-Consult | BROWN, MELINDA, MRC |
| 1/27/2025 12:24:07 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 1/28/2025 1:17:12 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 1/29/2025 2:13:32 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 1/29/2025 9:46:03 AM | CONSULT FINAL FINDINGS DOCUMENTATION | Medical | Consult Final Findings, Consultation, Post-Consult | BROWN, MELINDA, MRC |
| 2/5/2025 3:06:17 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 2/4/2025 10:17:00 AM | CONSULT FINAL FINDINGS DOCUMENTATION | Medical | Consult Final Findings, Consultation, Pre-Consult | BROWN, MELINDA, MRC |
| 2/12/2025 9:57:18 AM | CONSULT FINAL FINDINGS DOCUMENTATION | Medical | Consult Final Findings, Consultation, Post-Consult | BROWN, MELINDA, MRC |
| 2/19/2025 3:39:38 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 2/19/2025 2:23:23 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 2/18/2025 3:38:42 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | WITHERITE, JORDAN, MRC |
| 3/3/2025 1:36:33 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | STRONG, JERRICA LEE, LPN |
| 3/24/2025 3:45:14 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | STRONG, JERRICA LEE, LPN |

**Patient Document Upload Summary**

**Facility:**       PAMV - MOSHANNON VALLEY CORR CENTER

**Created By:**    ANNA, KAYLA

**Created On:**    8/26/2025 6:55:06 AM

| | | | | |
|---|---|---|---|---|
| 3/24/2025 3:47:09 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | STRONG, JERRICA LEE, LPN |
| 3/11/2025 12:50:56 PM | INMATE REQUEST TO STAFF | Medical | Medical | WITHERITE, JORDAN, MRC |
| 3/20/2025 11:24:39 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | MAXIM, LILLIAN, CDA |
| 3/24/2025 10:57:25 AM | KOP MED SIGN OUT SHEET | Medical | Medication, Medication Verification | STRONG, JERRICA LEE, LPN |
| 3/28/2025 11:10:12 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | SANKER, JONATHAN, MRC |
| 4/10/2025 7:56:37 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | SANKER, JONATHAN, MRC |
| 3/25/2025 8:05:41 AM | consent to influenza vaccine | Medical | Consent, Consultation, Immunizations, Pre-Consult | BROWN, MELINDA, MRC |
| 4/2/2025 12:37:40 PM | Diagnostic Notification form | Medical | Laboratory | SANKER, JONATHAN, MRC |
| 4/25/2025 12:34:17 PM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | SANKER, JONATHAN, MRC |
| 4/9/2025 11:52:51 AM | INMATE REQUEST TO STAFF | Medical | Medical | BROWN, MELINDA, MRC |
| 4/11/2025 6:31:25 AM | SICK CALL - ROUTINE  REQUEST FOR HEALTH SERVICES | Medical | Sick Call | BROWN, MELINDA, MRC |
| 4/8/2025 9:55:50 AM | INMATE REQUEST TO STAFF | Medical | Medical | MAXIM, LILLIAN, CDA |
| 4/4/2025 7:04:05 AM | CONSULT AUTHORIZATION | Medical | Authorization, Consultation, Pre-Consult | BROWN, MELINDA, MRC |

**Patient Document Upload Summary**

**Facility:** PAMV - MOSHANNON VALLEY CORR CENTER

**Created By:** ANNA, KAYLA

**Created On:** 8/26/2025 6:55:06 AM

# EXHIBIT I

EXHIBIT I

**U.S. Immigration and Customs Enforcement**

Alien Name (Nombre del extranjero): D█, A███, J███ D█

Alien Number (A #) (Numero de extranjero): █████

Date (Fecha): 6/23/25

## AVISO DE DEPORTACIÓN

Esta carta le informa que Inmigración y Control de Aduanas de los Estados Unidos tiene la intención de deportarlo a MEXICO.

---

### CERTIFICATE OF SERVICE

I certify that, on today's date, the contents of this notice were read to ████████ n the Spanish language, and I served the alien a copy of this notice in person.

_____

Signature of Alien

DO 9677
Title and Signature of ICE Official

6/23/25
Date of Service

14/00
Time of Service

_____

Name or Number of Interpreter (if applicable)

**U.S. DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**

Alien Name: D██, A████, J██████ D███

Alien Number (A #): ██████████

Date: 6/23/25

## NOTICE OF REMOVAL

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) intends to

Remove you to MEXICO.

---

### CERTIFICATE OF SERVICE

I certify that, on today's date, the contents of this notice were read to ████████████
Ernesto in the English language, and I served the alien a copy of this notice in person.

_____          6/23/25
Signature of Alien                     Date of Service

DO 9677                                1400
Title and Signature of ICE Official    Time of Service

_____
Name or Number of Interpreter (if applicable)

---

**U.S. DEPARTMENT OF HOMELAND SECURITY**

# EXHIBIT  J



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ELIZABETH IMMIGRATION COURT**

Respondent Name:

D█ A█, J█ D█

To:

Scott, Shayna
49 Thomas Street
5th Floor
New York, NY 10013

A-Number:

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
06/26/2025

## ORDER OF THE IMMIGRATION JUDGE

Respondent has applied for a stay of removal in connection with a Motion to Reopen or Motion to Reconsider.

Upon consideration of the representations and submissions made by and on behalf of Respondent and the Department of Homeland Security, it is hereby ordered that the application for a stay of removal:

☑ be granted, to be effective until determination of the motion.

☐ be denied.

Immigration Judge: BAILEY, RICHARD 06/26/2025

Appeal:  Department of Homeland Security:  ☐ waived   ☐ reserved
         Respondent:                       ☐ waived   ☐ reserved

Appeal Due:

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : DI█ A█████, JO█████ D████ | A-Number : █████████

Riders:

Date: 06/26/2025 By: VITALI, PATRICIA, Court Staff

# EXHIBIT  K



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ELIZABETH IMMIGRATION COURT**

Respondent Name:

D█ A█████, J██████ D███

To:

Scott, Shayna
49 Thomas Street
5th Floor
New York, NY 10013

A-Number:

████████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
07/17/2025

### ORDER OF THE IMMIGRATION JUDGE

☑ Respondent ☐ the Department of Homeland Security has filed a motion to reopen these proceedings. Upon reading and considering the motion, and any opposition from the non-moving party, the motion is ☑ granted ☐ denied for the following reason(s):

☐ The motion is untimely and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).
☐ The motion is numerically barred and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).
☐ The moving party failed to provide evidence demonstrating changed circumstances that is material and that was unavailable or could not have been discovered or presented at the previous proceedings. *See* 8 C.F.R. § 1003.23(b)(4)(i).
☐ The moving party failed to submit the appropriate application for relief and any accompanying documents. *See* 8 C.F.R. § 1003.23(b)(3).
☐ The Respondent has been removed or otherwise departed from the United States. *See* 8 C.F.R. § 1003.23(b)(1).
☑ Other:

DHS has not filed an opposition to the motion or made any representations as to whether respondent has been removed from or otherwise departed the United States. The Court exercises its sua sponte authority to reopen proceedings. In reopened proceedings, the parties may brief, among other issues, whether the Court has authority under the INA to hear a claim for withholding of removal from a country that has not been designated as the country of removal.

Immigration Judge: BAILEY, RICHARD 07/17/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : D     A        , J          D     | A-Number :

Riders:

Date: 07/17/2025 By: VITALI, PATRICIA, Court Staff